Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Priscilla D. Kam, Esq.
Joanna B. Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

                                          Plaintiffs,

                      -against-

RENAN MACIAS, M.D.
JOSEPH DORSTEN, D.O.
LIFELINE MEDICAL IMAGING, P.C.,
AMIT KHANEJA, M.D.,
AMIT KHANEJA NEUROLOGY PRACTICE, PLLC,
HILLSIDE PRIMARY MEDICAL CARE, P.C., and
JOHN DOE DEFENDANTS "1" THROUGH "10,"

                                        Defendants.

-------------------------------------------------------------------X

Docket No.:_____ (     )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, Renan Macias, M.D., Joseph Dorsten,

D.O., Lifeline Medical Imaging, P.C., Amit Khaneja, M.D., Amit Khaneja Neurology Practice,

PLLC, Hillside Primary Medical Care, P.C., and John Doe Nos. "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $710,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent "No-Fault" insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including videonystagmus testing ("VNG") and transcranial doppler testing ("TDT") (collectively the "Fraudulent Services"), which were allegedly provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for coverage under New York No-Fault insurance policies issued by GEICO.

2.     Defendants, Renan Macias, M.D. ("Dr. Macias"), Joseph Dorsten, D.O. ("Dr. Dorsten"), and Amit Khaneja, M.D. ("Dr. Khaneja") (collectively, the "Owner Defendants") are physicians licensed to practice in New York. Dr. Dorsten and Dr. Khaneja, along with non-party Dr. Andre Jocelyn Duhamel ("Dr. Duhamel"), purport to own – and submitted excessive billing for the medically useless Fraudulent Services through – Lifeline Medical Imaging, PC ("Lifeline"), Amit Khaneja Neurology Practice, PLLC ("Amit Khaneja Neurology"), and Hillside Primary Medical Care ("Hillside"), respectively. Dr. Macias submitted billing to GEICO for the same Fraudulent Services under his personal tax identification number (the "Fraudulent Macias Practice".) (Lifeline, Hillside, Amit Khaneja Neurology, and the Fraudulent Macias Practice are collectively referred to hereinafter as the "Provider Defendants").

3.     The Provider Defendants purported to be legitimate medical professional corporations and healthcare practices, but they operated on a transient basis, maintaining no stand-

alone practices, having no patients of their own, and providing no legitimate or medically necessary services to GEICO's Insureds.

4.　　Instead, the Provider Defendants purported to travel to the offices of numerous multidisciplinary medical clinics that primarily treated No-Fault patients (the "No-Fault Clinics"), where they provided the Fraudulent Services pursuant to pre-determined protocols -- to the extent that the services were provided at all – solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.　The Providers Defendants also generated reports for the Fraudulent Services containing the same pre-printed boilerplate results and conclusions, regardless of which Provider Defendant purported to perform the Fraudulent Services.

5.　　As an essential part of the fraudulent scheme, the Defendants entered into illegal, referral and kickback arrangements to permit the Provider Defendants to access a steady stream of patients, fraudulently bill GEICO, and exploit New York's No-Fault insurance system for financial gain without regard to genuine patient care.

6.　　By this action GEICO seeks to recover the monies stolen from it and seeks a declaration that it is not legally obligated to pay reimbursement of more than $2,800,000.00 in pending No-Fault insurance claims that have been submitted by or on behalf of the Provider Defendants because:

> (i)　　The Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

> (ii)　　The Fraudulent Services were provided – to the extent they were provided at all – pursuant to a fraudulent scheme involving illegal kickback and patient referral arrangements;

(iii)   In certain cases, the Fraudulent Services were provided by independent contractors, rather than by employees of the Provider Defendants, and therefore were unreimbursable under New York law; and

(iv)   In certain cases, the Provider Defendants were not lawfully licensed as they were nominally owned by licensed healthcare providers who did not actually practice through the professional corporation as required by law.

7.     The Defendants fall into the following categories:

(i)    The Provider Defendants (the Fraudulent Macias Practice, Lifeline, Amit Khaneja Neurology, and Hillside) are New York medical professional corporations and healthcare practices through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

(ii)   The Owner Defendants (Dr. Macias, Dr. Dorsten, and Dr. Khaneja), are physicians licensed to practice medicine in New York who, along with non-party Dr. Duhamel, purport to own the Provider Defendants and who purported to perform some of the Fraudulent Services.

(iii)  John Doe Defendants "1" – "10" are persons and entities, presently not identifiable, who participated in and furthered the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

8.     The Defendants' scheme began in 2018 and continues uninterrupted to the present day. As discussed more fully below, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the Fraudulent Services were provided – to the extent they were provided at all – pursuant to illegal kickback and patient referral arrangements; (iii) the Fraudulent Services billed through Lifeline and Hillside were provided by independent contractors rather than by employees of Lifeline and Hillside in violation of New York law and the No-Fault laws; and (iv) Lifeline and Hillside are professional

corporations operating in violation of material licensing laws in that they are medical professional corporations nominally owned by physicians who does not actually practice medicine through the professional corporations.

9.     Based on the foregoing, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Provider Defendants.

10.     The charts annexed hereto as Exhibits "1" – "4" set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO. As a result of the Defendants' scheme GEICO has incurred damages of more than $710,000.00.

## THE PARTIES

### I.   Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

12.     Defendant Dr. Macias resides in and is a citizen of New York. Dr. Macias was licensed to practice medicine in New York on March 7, 1975 and purports to own the Fraudulent Macias Practice which submitted billing to GEICO using Dr. Macias' personal tax identification number.

13.     Defendant Dr. Dorsten resides in and is a citizen of New York. Dr. Dorsten was licensed to practice medicine in New York on June 28, 1995 and purports to own Defendant Lifeline.

14.     Lifeline is a New York medical professional corporation through which the Fraudulent Services have been billed to insurance companies, including GEICO. Lifeline was incorporated on December 31, 2018 with its principal place of business at 183 Pinehurst Avenue, Apartment 52, New York, New York.

15.     Defendant Dr. Khaneja resides in and is a citizen of New York. Dr. Khaneja was licensed to practice medicine in New York on November 7, 2012 and, upon information and belief, is the sole member of Defendant Amit Khaneja Neurology.

16.     Amit Khaneja Neurology is a New York professional limited liability company through which the Fraudulent Services have been billed to insurance companies including GEICO. Amit Khaneja Neurology was formed on May 5, 2014 with its principal place of business at 1155 Warburton Avenue, #1U, Yonkers, New York.

17.     Hillside is a New York professional corporation through which the Fraudulent Services have been billed to insurance companies including GEICO. Hillside was incorporated on December 24, 2012 with its principal place of business at 20 West 190th Street, Bronx, New York.

18.     Hillside is purportedly owned by non-party Dr. Duhamel.

19.     John Doe Defendants "1" though "10" are additional individuals and entities whose names are not yet known to GEICO.  John Doe Defendants "1" through "10" at all times have participated in and furthered the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient

referrals for the Provider Defendants, and employing pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

**III.**    **Non-Party Dr. Duhamel**

20.    Dr. Duhamel resides in and is a citizen of New York. Dr. Duhamel was licensed to practice medicine in New York on June 15, 2006 and purports to own Hillside.

21.    Dr. Duhamel is no stranger to No-Fault fraud schemes. He was previously sued for prescribing medically unnecessary pharmaceutical products to GEICO Insureds in exchange for kickbacks. Gov't Employees Ins. Co et al. v. 21st Century Pharmacy, Inc. et al., 1:16-cv-04826(ERK)(JO). Furthermore, Dr. Duhamel previously admitted to GEICO that (i) he was directed by unlicensed laypersons at various No-Fault Clinics to prescribe certain pharmaceuticals; (ii) prescriptions forms containing his signature were altered without his authorization; and (iii) billing to insurance companies for certain healthcare services using his name was submitted without his knowledge or consent.

22.    Dr. Duhamel has a history of professional misconduct that has resulted in discipline by the State of New York Board for Professional Medical Conduct (the "New York State Board"). In February 2000 the New York State Board suspended Dr. Duhamel's license for two years, stayed with probation. In January 2016, the New York State Board imposed a further term of probation. As of February 2021, Dr. Duhamel had charges against him pending with the Office of Professional Misconduct ("OPMC") for practicing without a practice monitor, failing to provide the OPMC with

current information about his employment, and failing to maintain a log of his ordering, prescribing, administering, and/or dispensing of controlled substances.

23.     By Order dated June 28, 2021, the New York State Board concluded, among other things, that Dr. Duhamel's condition rendered him unfit to continue practicing medicine and revoked his license effective seven days thereafter.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No-Fault Laws and Licensing Statutes

26.     GEICO underwrites automobile insurance in New York.

27.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins.

Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

29.     An Insured can assign his/her right to No-Fault Benefits to healthcare goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

30.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

31.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …

32.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a

professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.

33.     Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

34.     New York law prohibits licensed healthcare providers from paying or accepting payments (i.e., kickbacks) in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6531.

35.     Pursuant to Education Law §6512, §6530 (11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

36.     Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensee to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee.

37.     Pursuant to 8 N.Y.C.R.R. §29.1(b)(3) a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

38.     Pursuant to Education Law §6530(19), it is professional misconduct under certain circumstances for a licensee to permit any person to share in fees for professional services.

39.     New York law also prohibits anyone from engaging in, for profit, any business or service which in whole or in part includes the referring or recommending of persons to a physician, hospital, health related facility, or dispensary for any form of medical care or treatment.  See, New York Public Health Law §4501.  Similarly, no facility delivering health care services shall in any manner split fees with a medical referral service. See, New York Public Health Law §2811.

40.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful kickbacks in exchange for patient referrals.

41.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

42.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

43.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill

11

for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

44.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule")

45.     When a healthcare service provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

46.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**II.     The Defendants' Fraudulent Scheme**

**A.  Overview of the Scheme**

47.     Beginning in 2018 and continuing uninterrupted through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they used the Provider Defendants to exploit Insureds for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges relating to the Fraudulent Services purportedly provided to the Insureds.

48.     The Provider Defendants purport to be legitimate medical professional corporations and healthcare practices but instead operated as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers.

49.     The Fraudulent Services billed under the names of the Provider Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render healthcare services.

50.     The Owner Defendants (as well as Dr. Duhamel) did not operate the Provider Defendants at any single, fixed office location.

51.     The Owner Defendants (as well as Dr. Duhamel) did not market the existence of any of the Provider Defendants to the general public.

52.     The Owner Defendants (as well as Dr. Duhamel) did not advertise for patients, never sought to build name recognition or make any legitimate efforts of their own to attract patients on behalf of any of the Provider Defendants.

53.     The Owner Defendants (as well as Dr. Duhamel) did not perform actual examinations of patients or offer a variety of treatments and services through the Provider Defendants as typically would be expected of licensed medical doctors treating individuals involved in automobile accidents.

54.     The Owner Defendants (as well as Dr. Duhamel) did not provide any legitimate or medically necessary services through the Provider Defendants.

55.     The Provider Defendants' services were almost entirely focused on the Fraudulent Services (*i.e.*, videonystagmus testing ("VNG") and transcranial doppler testing ("TDT")).

56.     During the time in which the Provider Defendants rendered the Fraudulent Services, the Fraudulent Services have made up approximately 90% of the billing submitted to GEICO by the Fraudulent Macias Practice and Lifeline, and approximately 100% of the billing submitted to GEICO by each Amit Khaneja Neurology and Hillside.

57.     The Providers Defendants typically generated reports for the Fraudulent Services using the same pre-printed boilerplate results or conclusions, regardless of which Provider Defendant purported to perform the Fraudulent Services.

58.     At times, multiple Provider Defendants administered Fraudulent Services to the same Insured.

59.     The Owner Defendants (as well as Dr. Duhamel) did not have their own patients and did nothing to create a patient base for the Provider Defendants.

60.     The Owner Defendants (as well as Dr. Duhamel) did virtually nothing that would be expected of the owners of legitimate medical professional corporations and sole proprietorships to develop their reputation and attract patients.

61.     Instead, the Defendants operated the Provider Defendants on an itinerant basis from multiple No-Fault Clinics located in Brooklyn, Queens, Bronx, Manhattan, and Long Island, where the Provider Defendants received steady volumes of patients through no efforts of their own but rather by accessing the patient base already established at each No-Fault Clinic.

62.     Upon information and belief, the Fraudulent Macias Practice billed for services purportedly provided to Insureds at the following No-Fault Clinics:

> (i)      3041 Avenue U, Brooklyn, New York
>
> (ii)     7945 Metropolitan Avenue, Middle Village, New York
>
> (iii)    4250 White Plains Road, Bronx, New York

(iv)    108-25 Merrick Boulevard, Jamaica, New York

(v)    37-03 92nd Street, Jackson Heights, New York

(vi)    59 94th Street, Queens, New York

(vii)    647 Bryant Avenue, Bronx, New York

(viii)    3322 East 149th Street, Bronx, New York.

63.    Lifeline billed for services purportedly provided to Insureds at, among others, the following No-Fault Clinics:

(i)    3041 Avenue U, Brooklyn, New York

(ii)    7945 Metropolitan Avenue, Middle Village, New York

(iii)    430 West Merrick Road, Valley Stream, New York

(iv)    205-16 Jamaica Avenue, Hollis, New York

(v)    381 Rockaway Avenue, Brooklyn, New York

(vi)    3250 Westchester Avenue, Bronx, New York

(vii)    37-03 92nd Street, Jackson Heights, New York

(viii)    647 Bryant Avenue, Bronx, New York

(ix)    1786 Flatbush Avenue, Brooklyn, New York

(x)    2488 Grand Concourse, Bronx, New York

(xi)    14821 Jamaica Avenue, Jamaica, New York

(xii)    1 Fulton Avenue, Hempstead, New York

(xiii)    513 Church Avenue, Brooklyn, New York

(xiv)    395D Pearsall Avenue, Cedarhurst, New York

(xv)    1122 Coney Island Avenue, Brooklyn, New York

(xvi)    1568 Ralph Avenue, Brooklyn, New York

(xvii)   1735 Pitkin Avenue, Brooklyn, New York

(xviii)  9016 Sutphin Boulevard, Jamaica, New York

(xix)   9208 Jamaica Avenue, Jamaica, New York

(xx)    97-01 101st Avenue, Queens, New York.

64.     Amit Khaneja Neurology billed for services purportedly provided to Insureds at, among others, the following No-Fault Clinics:

(i)     1314 Coney Island Avenue, Brooklyn, New York

(ii)    108-25 Merrick Avenue, Jamaica, New York

(iii)   11 E Hawthorne Avenue, Valley Stream, New York

(iv)    14 North Main Street, Spring Valley, New York

(v)     146 Empire Boulevard, Brooklyn, New York

(vi)    1655 Richmond Avenue, Staten Island, New York

(vii)   1975 Linden Boulevard, Elmont, New York

(viii)  2488 Grand Concourse, Bronx, New York

(ix)    3027 Avenue V, Brooklyn, New York

(x)     3041 Avenue U, Brooklyn, New York

(xi)    315 Madison Avenue, New York, New York

(xii)   3322 East 149th Street, Bronx, New York

(xiii)  37-03 92nd Street, Jackson Heights, New York

(xiv)   4226A 3rd Avenue, Bronx, New York

(xv)    4250 White Plain Road, Bronx, New York

(xvi)   430 West Merrick Road, Valley Stream, New York

(xvii)  513 Church Avenue, Brooklyn, New York

16

(xviii)  5414 Avenue N, Brooklyn, New York

(xix)    611 East 76th Street, Brooklyn, New York

(xx)     647 Bryant Avenue, Bronx, New York

(xxi)    665 Pelham Avenue, Bronx, New York

(xxii)   7945 Metropolitan Avenue, Middle Village, New York.

65.     Hillside billed for services purportedly provided to Insureds at, among others, the following No-Fault Clinics:

(i)      2598 3rd Avenue, Bronx, New York

(ii)     409 Rockaway Avenue, Brooklyn, New York

(iii)    1975 Linden Boulevard, Elmont, New York

(iv)     430 West Merrick Road, Valley Stream, New York

(v)      647 Bryant Avenue, Bronx, New York

(vi)     2184 Flatbush Avenue, Brooklyn, New York

(vii)    3910 Church Avenue, Brooklyn, New York

(viii)   176 Wilson Avenue, Brooklyn, New York

(ix)     204-12 Hillside Avenue, Hollis, New York

(x)      146 Empire Boulevard, Brooklyn, New York

(xi)     788 Southern Boulevard, Bronx, New York

(xii)    89-25 130th Street, Richmond Hill, New York

(xiii)   1120 Morris Park Avenue, Bronx, New York

(xiv)    552 East 180th Street, Bronx, New York

(xv)     632 Utica Avenue, Brooklyn, New York

(xvi)    1767 Southern Boulevard, Bronx, New York

(xvii)    599-601 Southern Boulevard, Bronx, New York

(xviii)   2 Lincoln Avenue, Suite 302, Rockville Centre, New York

(xix)     175 Fulton Avenue, Hempstead, New York

(xx)      717 Southern Boulevard, Bronx, New York

(xxi)     7945 Metropolitan Avenue, Middle Village, New York

(xxii)    1100 Pelham Parkway, Bronx, New York

(xxiii)   10510 Flatlands, Brooklyn, New York

(xxiv)    2488 Grand Concourse, Bronx, New York

(xxv)     37-03 92nd Street, Jackson Heights, New York

(xxvi)    2088 Flatbush Avenue, Brooklyn, New York

(xxvii)   148-21 Jamaica Avenue, Jamaica, New York

(xxviii)  180-09 Jamaica Avenue, Jamaica, New York

(xxix)    4250 White Plains Road, Bronx, New York

(xxx)     1849 Utica Avenue, Brooklyn, New York

(xxxi)    318 Seguine Avenue, Staten Island, New York

(xxxii)   3322 East 149th Street, Bronx, New York

(xxxiii)  11 E Hawthorne Avenue, Valley Stream, New York

(xxxiv)   513 Church Avenue, Brooklyn, New York

(xxxv)    3250 Westchester Avenue, Bronx, New York

(xxxvi)   1735 Pitkin Avenue, Brooklyn, New York

(xxxvii)      1655 Richmond Avenue, Staten Island, New York

(xxxviii)     2683 Flatbush Avenue, Brooklyn, New York

(xxxix)   3626 Bailey Avenue, Bronx, New York

(xl)     4226A 3rd Avenue, Bronx, New York

66.     The Provider Defendants operated at many of the same No-Fault Clinics at different times so the Defendants could disguise the volume of billing for the Fraudulent Services submitted to GEICO through the Provider Defendants from each clinic.

67.     For example, the Provider Defendants all billed GEICO for Fraudulent Services rendered at (i) 7945 Metropolitan Avenue, Middle Village, New York, (ii) 37-03 92nd Street, Jackson Heights, New York, and (iii) 647 Bryant Avenue, Bronx, New York.

68.     Additionally, Lifeline, Amit Khaneja Neurology, and Hillside all billed GEICO for Fraudulent Services rendered at: (i) 430 West Merrick Road, Valley Stream, New York, (ii) 2488 Grand Concourse, Bronx, New York, and (iii) 513 Church Avenue, Brooklyn, New York.

69.     Hillside and Amit Khaneja Neurology both billed GEICO for Fraudulent Services rendered at: (i) 1975 Linden Boulevard, Elmont, New York, (ii) 146 Empire Boulevard, Brooklyn, New York, (iii) 1655 Richmond Avenue, Staten Island, New York, (iv) 4226A 3rd Avenue, Bronx, New York, and (v) 11E Hawthorne Avenue, Valley Stream, New York.

70.     Furthermore, Hillside and Lifeline both billed GEICO for Fraudulent Services rendered at: (i) 148-21 Jamaica Avenue, Jamaica, New York, (ii) 1735 Pitkin Avenue, Brooklyn, New York, and (iii) 3250 Westchester Avenue, Bronx, New York.

71.     The Owner Defendants (as well as Dr. Duhamel) had no genuine doctor-patient relationship with the Insureds that visited the No-Fault Clinics, as the patients had no scheduled appointments with the owners of the Provider Defendants or the Provider Defendants themselves

72.     The Insureds that were subjected to services by the Provider Defendants, to the extent any actual services were provided, were simply directed by the No-Fault Clinics to subject

themselves to treatment by whatever doctor or other healthcare professional was working at the No-Fault Clinic that day, regardless of whether there was any legitimate need for healthcare services.

### B. Illegal Kickback and Referral Relationships

73.     In addition to the Provider Defendants, the No-Fault Clinics house a "revolving door" of medical professional corporations, chiropractic professional corporations, acupuncture professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting the New York No-Fault insurance system.

74.     In fact, GEICO received billing from many of the No-Fault Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

75.     For example, GEICO has received billing for purported healthcare services rendered by a "revolving door" of more than 100 purportedly different healthcare providers at each of the No-Fault Clinics located at 3910 Church Avenue, Brooklyn (the "3910 Church Ave Clinic"); 717 Southern Boulevard, Bronx; 632 Utica Avenue, Brooklyn; 1 Fulton Avenue, Hempstead; and 2488 Grand Concourse, Bronx.

76.     Similarly, GEICO has received billing for purported healthcare services rendered at the No-Fault Clinic located at 205-16 Jamaica Avenue, Jamaica from a "revolving door" of more than 80 purportedly different healthcare providers.

77.     GEICO has received billing for purported healthcare services rendered by a "revolving door" of approximately 75 purportedly different healthcare providers at the each of the No-Fault Clinics located at 1120 Morris Park Avenue, Bronx; 513 Church Avenue, Brooklyn; and 665 Pelham Parkway, Bronx.

78.     GEICO has received billing for purported healthcare services rendered by a "revolving door" of approximately 60 purportedly different healthcare providers at each of the No-Fault Clinics located at 1568 Ralph Avenue, Brooklyn; 764 Elmont Road, Elmont; and 430 West Merrick Boulevard, Valley Stream.

79.     GEICO has received billing for purported healthcare services rendered by a "revolving door" of at least 50 purportedly different healthcare providers at each of the No-Fault Clinics located at 647 Bryant Avenue, Bronx and 611 East 76th Street, Brooklyn.

80.     Unlicensed laypersons, rather than the healthcare professionals working in the No-Fault Clinics, cultivated and controlled the patient base at the No-Fault Clinics and implemented fraudulent treatment and billing protocols used to maximize profits without regard to actual patient care.

81.     For example, many of the medical providers at the 3910 Church Ave Clinic were named as defendants in a federal RICO action where GEICO credibly alleged that the location was owned and controlled by laypersons and the medical providers performed medically unnecessary services based on the improper financial (and other) relationships among the defendants and laypersons.  See Government Employees Insurance Co., et al., v. East Flatbush Medical, P.C., et al., 20-CV-1695 (MKB)(PK).

82.     In fact, in East Flatbush, a physician who worked at the 3910 Church Ave Clinic stated under oath that he ended his involvement with this clinic because of, among other things, (i)

his concern about the manner in which patients were brought to the clinic; (ii) the manner in which the clinic was operated; (iii) the use of his signature stamp without his consent; and (iv) the submission of billing for services through his personal tax identification number without his consent.

83.     As a further example, a physician who worked at multiple No-Fault Clinics, including the 180-09 Jamaica Avenue, Jamaica Clinic, stated under oath that: (i) as a condition of employment she was required to prescribe topical pain creams to no-fault patients on a protocol basis; (ii) the front desk personnel at the clinics became upset if she did not issue prescriptions or refer patients for physical therapy, or if she wanted to discharge a patient from care; and (iii) certain prescriptions that were purportedly authorized by her and submitted to GEICO were done without her knowledge or authorization.

84.     Furthermore, certain of the other providers who operated from the No-Fault Clinics and directed patients to the Provider Defendants have a history of professional misconduct that limited their opportunity to find employment at legitimate medical offices or to develop their own legitimate practices, leaving them to work for unlicensed laypersons at the No-Fault Clinics with their fraudulent treatment and billing protocols.

85.     For example, Stanley Kim, D.O. ("Dr. Kim") purportedly treated automobile accident victims through Metro Pain and referred Insureds to the Provider Defendants to receive the Fraudulent Services.

86.     In April 2016, Dr. Kim pled guilty to at least one count of Insurance Fraud in the 3rd Degree in connection with his submission of fraudulent claims to six different insurance companies for medical services he never provided.

87.     Similarly, Kristappa Sangavaram, M.D. ("Dr. Sangavaram") purportedly treated automobile accident victims through Tremont Medical and referred Insureds to the Provider Defendants to receive the Fraudulent Services.

88.     In April 2007, the New Jersey State Board suspended Dr. Sangavaram's license to practice medicine based on allegations that Dr. Sangavaram charged excessive fees under fraudulent circumstances, engaged in gross negligence, and violated New Jersey self-referral laws. In July 2014, the New Jersey State Board ordered, among other things, that Dr. Sangavaram pay for ongoing monitoring of his medical practice for the life of his medical license.

89.     Michael Alleyne, M.D. ("Dr. Alleyne") purportedly treated automobile accident victims through Metro Pain and referred Insureds to the Provider Defendants to receive the Fraudulent Services.

90.     In 1991, Dr. Alleyne admitted guilt in response to a series of charges file by the New York State Department of Health, Office of Professional Medical Conduct which resulted in seven-year license revocation that was converted to probation.

91.     Joseph A. Raia MD, P.C. (the "Raia P.C.") is a professional corporation allegedly owned by Dr. Raia, which was a source of referrals of Insureds to the Provider Defendants who received the Fraudulent Services.

92.     In 2014, Dr. Raia was charged by the Office of Inspector General ("OIG") with submitting false and fraudulent claims to Medicare for services that he never provided. As a result of those charges Dr. Raia was excluded from participating in all federal healthcare programs for fifteen years and was required to pay $1.5 million in penalties.

23

93.     S. Ramachandran Nair, M.D. ("Dr. Ramachandran") purportedly treated automobile accident victims through S. Ramachandran Nair, M.D. P.C. (the "Nair M.D. P.C.") and referred patients to the Provider Defendants to receive the Fraudulent Services.

94.     In April 2003, Dr. Ramachandran pled guilty to, among other things, submitting a Medicaid claim that contained false information and false services and he was excluded from participating in Medicare and all other federally funded health care programs for a period of five years. Thereafter, in September 2006, Dr. Ramachandran was placed on probation by the New York State Board after being charged with two counts of professional misconduct for his failure to maintain accurate medical records.

95.     Elliot Strauss, D.C. ("Dr. Strauss") is a chiropractor who purportedly referred patients to the Provider Defendants for the Fraudulent Services.

96.     Strauss' license to practice chiropractic in New York has been inactive since April 2019.  Nevertheless, he purportedly referred patients to the Provider Defendants for the Fraudulent Services as recently as June 2020.

97.     The Owner Defendants and the Provider Defendants, like the other providers who operated from the No-Fault Clinics, did not control the patient base, did not provide legitimate or necessary healthcare services to the Insureds and were required to subject themselves to the dictates of unlicensed laypersons at the No-Fault Clinics.

98.     The Owner Defendants and the Provider Defendants, in order to obtain access to the No-Fault Clinics' patient base (i.e., Insureds), entered into illegal financial arrangements with unlicensed persons, including John Doe Defendants "1"-"10", who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics.  These were "pay-to-play"

arrangements made in order to steer Insureds to the Provider Defendants for medically unnecessary services at the No-Fault Clinics.

99.     The No-Fault Clinics had no legitimate reason to refer Insureds to the Provider Defendants since the Provider Defendants provided no legitimate or necessary healthcare services to the Insureds.

100.     The financial arrangements that the Owner Defendants and the Provider Defendants entered into included the payment of fees ostensibly to "rent" space or personnel from the No-Fault Clinics or fees for ostensibly legitimate services such as marketing, advertising, consulting, billing, and collection services.  However, these were "pay-to-play" arrangements that amounted to kickback payments for having Insureds referred to one or more of the Provider Defendants for the medically unnecessary Fraudulent Services.

101.     In exchange for the kickbacks, when an Insured visited one of the No-Fault Clinics, he or she was automatically referred to the various healthcare providers operating from the clinic, including the Provider Defendants.

102.     The amount of the kickbacks paid by Defendants generally was based on the volume of Insureds that were steered to the Provider Defendants for the medically unnecessary Fraudulent Services.

103.     The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme. Defendants derived significant financial benefit from the relationships because without access to the Insureds, Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers huge sums for the Fraudulent Services.

104.    The Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

105.    The Defendants engaged in the fraudulent scheme knowing that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the Fraudulent Services were provided pursuant to a fraudulent scheme involving illegal referral and kickback relationships; (iii) the Fraudulent Services provided by Lifeline and Hillside were provided by independent contractors rather than by employees, and therefore were unreimburseable; and (iv) the alleged owners of Lifeline and Hillside have never practiced medicine through the professional corporations as is required by New York law.

**C.  The Defendants' Fraudulent Treatment and Billing Protocols**

106.    As part of this fraudulent scheme the Provider Defendants purported to provide the Fraudulent Services to virtually all Insureds without regard for the nature of the accident or the Insureds' individual symptoms, presentation, or actual medical needs.

107.    No legitimate healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

108.    Defendants permitted the fraudulent treatment and billing protocol described below to proceed because Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

109.    As part of the predetermined protocol, various other providers operating at the No-Fault Clinics (the "Referring Providers") produced generic, preprinted, and boilerplate

examination reports designed to justify continued, voluminous, and excessive healthcare services that the providers at the No-Fault Clinics purported to render to Insureds.  These healthcare services included medically unnecessary VNG and TDT.

110.    Notwithstanding the creation of the examination reports, the Referring Providers referred patients to the Provider Defendants for VNG and TDT pursuant to predetermined protocols designed to exploit Insureds for financial gain, without regard to their genuine needs.

111.    To the extent any examination was actually performed, and in keeping with the fact that the Fraudulent Services were provided pursuant to a predetermined fraudulent treatment protocol, the Referring Providers often failed to document whether the patients they referred for the Fraudulent Services were exhibiting any of the conditions that would necessitate performance of the Fraudulent Services.

112.    For example, as part of their examinations, the Referring Providers frequently did not screen for dizziness, vertigo, gait disturbances, or other relevant symptoms prior to referring the Insureds to the Provider Defendants for the Fraudulent Services.

113.    Additionally, the Referring Providers virtually never documented in their examination reports that a patient was being referred to one of the Provider Defendants to receive the Fraudulent Services.

114.    The Referring Providers virtually never documented that they informed the patients of the proper way to prepare for VNG, e.g. abstaining from medication, stimulants, and food. Failure to properly prepare for VNG renders any results generated therefrom unreliable.

115.    The Referring Providers also continuously failed to document in their follow-up examinations whether patients actually underwent VNG and/or TDT with the Provider Defendants or the results of the VNG and TDT performed by the Provider Defendants.

116.     Indeed, in keeping with the fact that the Fraudulent Services were performed pursuant to a predetermined fraudulent treatment protocol designed to maximize billing to GEICO without regard for the needs of the patients, the results of the Fraudulent Services were virtually never incorporated into the patients' treatment plans, even under the limited circumstances in which the testing returned positive results or the Provider Defendants recommended the patient undergo additional treatment.

117.     In further keeping with the fact that the Fraudulent Services were medically unnecessary and administered pursuant to a predetermined fraudulent treatment protocol, when the Fraudulent Services returned inconclusive results the Insureds virtually never underwent additional testing in an attempt to generate conclusive results.

118.     In further keeping with the fact that the Fraudulent Services were performed pursuant to a predetermined treatment protocol without regard for medical necessity, at times the Provider Defendants performed the Fraudulent Services on Insureds pursuant to referrals from medical providers who never examined the Insureds prior to referring them for the Fraudulent Services.

119.     Additionally, to the extent the Referring Providers performed an examination prior to generating a written referral for the Fraudulent Services, the referrals were rarely, if ever, issued on the date the Insured underwent such examination. Rather, the referrals were issued on the date the Fraudulent Services were performed, regardless of whether the Insured underwent a medical examination with the Referring Provider on that date.

120.     Moreover, the referrals for the Fraudulent Services, were often generated by chiropractors. In a legitimate clinical setting, referrals for TDT and/or VNG are generated by neurologists or ear, nose, and throat ("ENT") doctors.

121.    In further keeping with the fact that the Fraudulent Services were performed pursuant to a predetermined fraudulent treatment protocol, Amit Khaneja Neurology and Hillside used the same template neurological referral prescription form (the "Neurological Referral Form"). The Neurological Referral Form was nothing more than a template list of services that the Referring Providers could check off to identify the services for which the Insured was being referred.

122.    At times, the Neurological Referral Forms submitted by Hillside in support of their billing were incomplete. Specifically, at times the referrals from Hillside were unsigned, undated, or did not identify the type of neurological testing for which the Insured was being referred. Nonetheless the Insured received the Fraudulent Services. Attached as Exhibit "5" are examples of incomplete Neurological Referral Forms submitted by Hillside in support of their billing.

123.    Furthermore, and in keeping with the fact that the Defendants paid kickbacks to access the patients at the No-Fault Clinics and administered the Fraudulent Services pursuant to predetermined treatment protocols, at times multiple Provider Defendants administered the Fraudulent Services to the same Insured. For example:

(i)     On July 25, 2020, Insured LA was purportedly involved in a motor vehicle accident. On September 1, 2020, LA underwent TDT and VNG with Lifeline. On December 18, 2020, LA underwent an additional round of VNG with Hillside.

(ii)    On August 26, 2020, Insured FC was purportedly involved in a motor vehicle accident. On October 8, 2020, FC underwent VNG and TDT with Lifeline. On December 18, 2020, FC underwent an additional round of VNG and TDT with Hillside.

(iii)   On October 24, 2020, Insured DF was purportedly involved in a motor vehicle accident. On November 24, 2020, DF underwent TDT with Lifeline. On December 28, 2020, DF underwent VNG and an additional round of TDT with Hillside.

(iv)    On December 2, 2019, Insured DDLS was purportedly involved in a motor vehicle accident. On March 10, 2020, DDLS underwent TDT and VNG

with the Fraudulent Macias Practice. On October 27, 2020, DDLS underwent additional rounds of TDT and VNG with Hillside.

(v)     On November 7, 2019, Insured JB was purportedly involved in a motor vehicle accident. On February 17, 2020, JB underwent TDT and VNG with the Fraudulent Macias Practice. One week later on February 24, 2020, JB underwent additional rounds of both TDT and VNG with Amit Khaneja Neurology.

(vi)    On December 10, 2019, Insured LG was purportedly involved in a motor vehicle accident. On March 24, 2020, LG underwent TDT and VNG with Amit Khaneja Neurology. Three weeks later on April 14, 2020, LG underwent additional rounds of both TDT and VNG with the Fraudulent Macias Practice.

(vii)   On January 14, 2020, Insured JA was purportedly involved in a motor vehicle accident. On January 28, 2020, JA underwent TDT and VNG with the Fraudulent Macias Practice. On May 18, 2020, JA underwent additional rounds of both TDT and VNG with Amit Khaneja Neurology.

(viii)  On February 10, 2020, Insured LC was purportedly involved in a motor vehicle accident. On February 24, 2020, LC underwent TDT and VNG with the Fraudulent Macias Practice. One week later, on March 2, 2020, LC underwent additional rounds of both TDT and VNG with Amit Khaneja Neurology.

(ix)    On October 24, 2020, Insured JF was purportedly involved in a motor vehicle accident. Thereafter, on November 11, 2020, JF underwent TDT and VNG with Lifeline. On December 16, 2020 JF underwent additional rounds of TDT and VNG with Hillside.

**i.     The Fraudulent Videonystagmography Tests**

124.   The Defendants purported to subject many Insureds to medically unnecessary VNG tests.

125.   The charges for the VNG tests were fraudulent in that the VNG tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the kickbacks the Defendants paid that allowed the Defendants access to the No-Fault Clinics' patients.

126.     The Fraudulent Macias Practice, Amit Khaneja Neurology, and Hillside billed the VNG to GEICO under CPT codes 92537, 92540, 92546, 92547, and 92548 generally resulting in charges of $628.21 to $666.34 for each VNG test they purported to provide.

127.     Similarly, Lifeline billed the VNG tests to GEICO under CPT codes 92533, 92540, 92546, and 92548 generally resulting in charges of at least $381.52 for each VNG test it purported to provide.

(1) Legitimate Uses for VNG Tests

128.     VNG tests consist of tests that can be used to determine the cause of a patient's vertigo or balance disorder in cases where there are no readily recognizable contributing factors to the patient's condition.

129.     In other words, VNG tests are not used to confirm the existence of dizziness or a balance disorder, but rather to identify the origin of the condition in the relatively rare cases where it cannot be determined through an ENT or neurological medical examination. Generally, VNG tests are employed to determine the source of the generation of vertigo, i.e., the inner ear or brain.

130.     VNG tests record involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video cameras.  The patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination.

131.     There are four main components to VNG testing: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye movements associated with positions of the head; and (iv) the caloric test, which measures

responses to warm or cold water or air circulated through the ear canal. The cameras record the eye movements and display them on a video/computer screen. This allows the physician to see how the eyes move, which helps the physician assess the patient's balance, which in turn helps the physician assess the source of vertigo.

132.    To properly administer a VNG test, the patient must be prepared appropriately. This preparation typically requires 72 hours of abstention from medication (with the exception of heart, high blood pressure and anticonvulsant medications); 24 hours of abstention from stimulants such as caffeine, as well as alcohol; and three hours of food abstention. In addition, patients must be provided with a pre-test history and examination, to determine – among other things – the nature of the problematic symptoms and the patient's eye movements.

133.    VNG tests should not be used as a first-line diagnostic procedure when a patient reports dizziness as the result of automobile accident trauma.  A legitimate diagnostic process for a patient reporting dizziness following an automobile accident should begin with a physical examination, including an ENT and neurological examination, followed by conservative care. If the patient does not respond to conservative care, an MRI of the brain may be ordered. If a patient does not respond to conservative care, and the brain MRI is negative, the patient may be evaluated by an ENT or neurologist to determine if VNG is warranted. Virtually none of the Insureds were referred to the Provider Defendants by an ENT or a neurologist, many did not undergo conservative care prior to undergoing VNG testing with the Provider Defendants, and virtually none received a brain MRI prior to undergoing the VNG testing with the Provider Defendants.

(2)  The Defendants' Fraudulent VNG Test Charges

134.    The Provider Defendants did not perform independent evaluations on Insureds to determine if the VNG testing was medically necessary.

135.    Instead, the Provider Defendants performed the VNG testing pursuant to referrals issued by the Referring Providers as part of a pre-determined protocol.

136.    To the extent the Referring Providers conducted medical examinations that assessed the Insureds' neurological symptoms, virtually none of the Insureds who received VNG testing from the Provider Defendants reported experiencing dizziness, imbalance, or vertigo in the examination reports that preceded the VNG testing.

137.    In even more egregious cases, the diagnoses and test results documented in the Referring Providers' examination reports directly contradicted the need for the VNG tests, nevertheless the Defendants subjected the Insureds to multiple rounds of testing. For example:

(i)     On December 3, 2019, Insured KC was purportedly involved in a motor vehicle accident. On January 6, 2020, KC sought treatment with Metro Pain at a No-Fault Clinic located at 3041 Avenue U, Brooklyn, New York (the "Avenue U Clinic") and underwent a medical examination with Osewa Olatokunbo, N.P. ("Olatokunbo"). At that examination KC reported no vertigo, tinnitus, or balance problems and KC's gait was observed to be normal. Nevertheless, on January 8, 2020, KC underwent VNG with Lifeline at the Avenue U Clinic pursuant to a referral from William Elton, M.D. ("Dr. Elton") of Metro Pain.

(ii)    On September 20, 2020, Insured AJ was purportedly involved in a motor vehicle accident. On September 24, 2020, AJ sought treatment with the Raia P.C. at a No-Fault Clinic located at 92-08 Jamaica Avenue, Woodhaven, New York (the "92-08 Jamaica Avenue Clinic") with Olga Gibbons, M.D. ("Dr. Gibbons"). At that examination AJ reported no dizziness, vertigo, or tinnitus and he displayed no nystagmus. The Romberg Test performed on AJ, which measures a patient's ability to balance with his or her eyes closed, was negative, and no gait deviation was noted. Nevertheless, on November 10, 2020 AJ underwent VNG with Lifeline at the 92-08 Jamaica Avenue Clinic pursuant to a referral from Joseph Raia, M.D. ("Dr. Raia").

(iii)   On October 17, 2020 an Insured named MEN was purportedly involved in a motor vehicle accident. On October 22, 2020 MEN sought treatment with the Raia P.C. at the 92-08 Jamaica Avenue Clinic with Eric Kenworthy, M.D. ("Dr. Kenworthy"). At that examination MEN reported no dizziness, vertigo, or tinnitus and she displayed no nystagmus. The Romberg test performed on MEN was negative. Nevertheless, on December 8, 2020 MEN underwent VNG with Lifeline at the 92-08 Jamaica Avenue Clinic pursuant to a referral from Dr. Raia.

(iv)     On December 28, 2019, Insured DM was purportedly involved in a motor vehicle accident. On December 31, 2019, DM sought treatment with Marina Gadaborshev, D.C. ("Dr. Gadaborshev") at a No-Fault Clinic located at 5414 Avenue N, Brooklyn, New York (the "Avenue N Clinic"). That examination did not include an inquiry into whether DM was experiencing any dizziness, vertigo, or tinnitus, no observations were made as to DM's gait, and no neurological examination was completed. On December 31, 2019, DM also sought treatment with the Raia P.C. at the Avenue N Clinic with Dr. Raia. At that examination DM reported no dizziness, vertigo, or tinnitus and he displayed no nystagmus. The Romberg Test performed on DM was negative. Nevertheless, on February 3, 2020, DM underwent VNG with the Fraudulent Macias Practice.

(v)      On December 6, 2019, Insured KW was purportedly involved in a motor vehicle accident. On December 10, 2019, KW sought treatment with the Raia P.C. at the Avenue N Clinic with Dr. Raia. At that examination KW reported no dizziness, vertigo, or tinnitus. KW exhibited no gait deviation or nystagmus. The Romberg Test performed on KW was negative. On December 11, 2019, KW sought treatment with Dr. Gadaborshev at the Avenue N Clinic. That examination did not include an inquiry into whether KW was experiencing any dizziness, vertigo, or tinnitus, no observations were made as to KW's gait, and no neurological examination was completed. Nevertheless, on January 14, 2020, KW underwent VNG with the Fraudulent Macias Practice.

(vi)     On December 13, 2019, Insured BG was purportedly involved in a motor vehicle accident. On December 16, 2019, BG sought treatment with Glenridge Chiropractic P.C. ("Glenridge Chiro") at a No-Fault Clinic located at 1975 Linden Boulevard, Elmont, New York (the "Linden Boulevard Clinic") with James Noberini, D.C. ("Dr. Noberini"). At that examination BG reported no dizziness, vertigo, or tinnitus. On December 17, 2019, BG sought treatment with Metro Pain at the Linden Boulevard Clinic with Dr. Kim. At that examination BG reported no dizziness, vertigo, or tinnitus and his gait was observed to be intact. On December 30, 2019 and January 20, 2019, BG underwent follow up examinations at Glenridge Chiro at the Linden Boulevard Clinic with Dr. Noberini which did not include an inquiry into whether BG was experiencing any dizziness, vertigo, or tinnitus. Nevertheless, on January 20, 2020 GB underwent VNG with the Fraudulent Macias Practice.

(vii)    On January 12, 2020, Insured AD was purportedly involved in a motor vehicle accident. On January 15, 2020, AD sought treatment with Glendridge Chiro at the Linden Boulevard Clinic with Dr. Noberini. At that examination AD reported no dizziness, vertigo, or tinnitus. On January 16, 2020, AD sought treatment with Metro Pain at the Linden Boulevard Clinic with John Greco, M.D. ("Dr. Greco") at which AD reported no dizziness,

vertigo, or tinnitus and AD's gait was observed to be intact. On February 11, 2020 AD underwent a follow up examination at Glenridge Chiro at the Linden Boulevard Clinic with Dr. Noberini which did not include an inquiry into whether AD was experiencing any dizziness, vertigo, or tinnitus. On February 18, 2020, AD underwent a follow up examination with Metro Pain at the Linden Boulevard Clinic with Dr. Kim at which no inquiry was made into whether AD was experiencing dizziness, vertigo, tinnitus, or difficulty balancing. Nevertheless, on February 25, 2020, AD underwent VNG with the Fraudulent Macias Practice.

(viii)   On April 7, 2020, Insured MT was purportedly involved in a motor vehicle accident. On April 8, 2020, MT sought treatment with Bronx County Medical Care, P.C. ("Bronx County Medical") at a No-Fault Clinic located at 4014A Boston Road, Bronx, New York (the "Boston Road Clinic") with Jean Pierre Barakat, M.D. ("Dr. Barakat"). At that examination MT reported no dizziness, vertigo, or tinnitus and his gait was observed to be normal. On April 9, 2020, MT sought treatment with Corona Family Chiro at the Boston Road Clinic with Leonid Simakovsky, D.C. ("Dr. Simakovsky"). At that examination MT reported no dizziness, vertigo, or tinnitus. Nevertheless, on April 28, 2020, MT underwent VNG with the Fraudulent Macias Practice.

(ix)   On February 16, 2020, Insured CG was purportedly involved in a motor vehicle accident. On February 24, 2020, CG sought treatment with Syed Asim Maqsood Medical, P.C. ("Syed Medical") at a No-Fault Clinic located at 33-10 101st Street, Queens, New York (the "101st Street Clinic") with Syed Asim Maqsood, M.D. ("Dr. Maqsood"). At that examination CG reported no dizziness and his gait was observed to be normal. Nevertheless, on February 24, 2020, CG underwent VNG with the Fraudulent Macias Practice.

(x)   On June 5, 2019, Insured RP was purportedly involved in a motor vehicle accident. On June 7, 2019, RP sought treatment with the Center for Neurorestorative Medicine, P.C. ("Center for Neurorestorative Medicine") at a No-Fault Clinic located at 318 Seguine Avenue, Staten Island, New York (the "Seguine Avenue Clinic") with Jordan Fersel, M.D. ("Dr. Fersel"). At that examination RP reported no dizziness, vertigo, or tinnitus. He displayed no nystagmus or ataxia, the Romberg Test performed on RP was negative, and no gait deviation was noted. Nevertheless, on June 26, 2020, RP underwent VNG with the Fraudulent Macias Practice.

(xi)   On June 2, 2020, Insured PB was purportedly involved in a motor vehicle accident. On June 4, 2020, PB sought treatment with Pak Hong Sik M.D. Medical Care, P.C. (the "Pak Hong Sik P.C.") at a No-Fault Clinic located at 611 East 76th Street, Brooklyn, New York (the "76th Street Clinic") with Dr. Pak. At that examination PB reported no dizziness, vertigo, or tinnitus and his gait was normal. Nevertheless, on July 1, 2020, PB underwent VNG

at Amit Khaneja Neurology at the 76th Street Clinic pursuant to a Neurological Referral Form from Dr. Pak dated July 1, 2020.

(xii)    On May 12, 2020, Insured SK was purportedly involved in a motor vehicle accident. On May 20, 2020, SK sought treatment at the Nair M.D. P.C. at a No-Fault Clinic located at 1655 Richmond Avenue, Staten Island, New York (the "Richmond Avenue Clinic") with Dr. Ramachandran. At that examination SK reported no dizziness, vertigo, or tinnitus. He displayed no nystagmus, his gait was normal with no ataxia, and his Romberg Test was negative. Nevertheless, on May 25, 2020 SK underwent VNG with Amit Khaneja Neurology at the Richmond Avenue Clinic pursuant to a Neurological Referral Form from Dr. Ramachandran dated May 25, 2020.

(xiii)    On March 5, 2020, Insured AL was purportedly involved in a motor vehicle accident. On March 11, 2020, AL sought treatment with the Nair MD PC at the Richmond Avenue Clinic with Dr. Ramachandran. At that examination AL reported no dizziness, vertigo, or tinnitus. He exhibited no nystagmus and his Romberg Test was negative. Thereafter, on May 12, 2020, AL underwent a follow up examination with the Nair MD PC with Dr. Ramachandran. At that examination AL reported no dizziness. Nevertheless, on May 25, 2020, AL underwent VNG with Amit Khaneja Neurology at the Richmond Avenue Clinic pursuant to a Neurological Referral Form from Dr. Ramachandran dated May 25, 2020.

(xiv)    On February 19, 2020, Insured BOG was purportedly involved in a motor vehicle accident. On February 26, 2020, BOG sought treatment with the Nair MD PC at the Richmond Avenue Clinic with Dr. Ramachandran. At that examination BOG reported no dizziness, vertigo, or tinnitus. He exhibited no nystagmus, his gait was normal, and his Romberg Test was negative. Nevertheless, on May 25, 2020, BOG underwent VNG with Amit Khaneja Neurology at the Richmond Avenue Clinic pursuant to a Neurological Referral Form from Dr. Ramachandran dated May 25, 2020.

(xv)    On May 27, 2020, Insured JG was purportedly involved in a motor vehicle accident. On June 22, 2020, JG sought treatment with Golden Healthcare Chiropractic Diagnostic, P.C. ("Golden Healthcare") at a No-Fault Clinic located at 14 North Main Street, Spring Valley, New York (the "North Main Street Clinic") with Anthony Manoy, D.C. ("Dr. Manoy"). At that examination JG reported no dizziness, his gait was normal, and his Romberg Test showed "no body sway." Nevertheless, on July 29, 2020, Jusler Gourdet underwent VNG with Amit Khaneja Neurology at the North Main Street Clinic pursuant to a Neurological Referral Form from Dr. Manoy dated July 29, 2020.

(xvi)    On October 30, 2020 an Insured named AE was purportedly involved in a motor vehicle accident. On November 5, 2020 AE sought treatment with NY Metro Chiropractic, P.C. ("NY Metro Chiro") at 175 Fulton Avenue,

Hempstead, New York (the "Fulton Avenue Clinic") with Dr. Whitney. At that examination AE reported no dizziness, vertigo, or tinnitus and the Romberg Test performed on AE was negative. Nevertheless, on December 2, 2020 AE underwent VNG at Hillside at the Fulton Avenue Clinic pursuant to a Neurological Referral Form from Dr. Whitney which did not indicate what testing Hillside should perform dated December 2, 2020.

(xvii)   On November 13, 2020 an Insured named MD was purportedly involved in a motor vehicle accident. On November 19, 2020 MD sought treatment with the Pak Hong Sik P.C. at the Linden Boulevard Clinic with Dr. Pak. At that examination he reported no dizziness, vertigo, or tinnitus and her gait was normal. Nevertheless, on November 24, 2020 MD underwent VNG with Hillside at the Linden Boulevard Clinic pursuant to a Neurological Referral Form from Dr. Pak dated November 24, 2020.

138.    Although virtually none of the Insureds who received VNG displayed symptoms warranting the testing, the Defendants submitted, or caused to be submitted, hundreds of thousands of dollars in bills for VNG to GEICO, as part of the Fraudulent Services.

139.    Moreover, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident. These variables include, but are not limited to, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact.

140.    It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident would routinely require VNG testing at or about the same time.

141.    Even so, and in keeping with the fact that the VNG testing purportedly performed by the Provider Defendants was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, the Provider Defendants each routinely provided VNG testing to multiple Insureds involved in the same accident at or about the same time.

142.    The Fraudulent Macias Practice routinely provided VNG testing to multiple Insureds involved in the same accident at or about the same time as follows:

(i)     On August 1, 2019, two insureds – DC and HM – were involved in the same automobile accident.  Thereafter, DC and HM both – incredibly – received VNG testing from the Fraudulent Macias Practice on September 4, 2019.

(ii)    On July 15, 2019, three insureds – JA, DA, and MA – were involved in the same automobile accident.  Thereafter, JA, DA, and MA all – incredibly – received VNG testing from the Fraudulent Macias Practice on August 21, 2019.

(iii)   On November 23, 2019, three insureds - AJ, DR, and SS - were involved in the same automobile accident. Thereafter, AJ, DR, and SS all - incredibly- received VNG testing from the Fraudulent Macias Practice on November 26, 2019.

(iv)    On June 4, 2019, two insureds - SI and WI - were involved in the same automobile accident. Thereafter, SI and WI both - incredibly- received VNG testing from the Fraudulent Macias Practice on August 21, 2019.

(v)     On May 18, 2019, two insureds - LD and JD - were involved in the same automobile accident. Thereafter, LD and JD both - incredibly- received VNG testing from the Fraudulent Macias Practice on January 28, 2020.

(vi)    On September 26, 2019, two insureds - DS and JA - were involved in the same automobile accident. Thereafter, DS and JA both - incredibly- received VNG testing from the Fraudulent Macias Practice on November 19, 2019.

(vii)   On May 14, 2020, three insureds - FB, RB, and EC - were involved in the same automobile accident. Thereafter, FB, RB, and EC all - incredibly- received VNG from the Fraudulent Macias Practice on June 4, 2020.

(viii)  On May 24, 2019, three insureds - BS, MR, and LS - were involved in the same automobile accident. Thereafter, BS, MR, and LS all – incredibly – received VNG testing from the Fraudulent Macias Practice on June 12, 2019.

(ix)    On December 11, 2019, two insureds - CB and DW - were involved in the same automobile accident. Thereafter, CB and DW both – incredibly – received VNG testing from the Fraudulent Macias Practice on December 19, 2019.

(x)     On February 4, 2020, two insureds - MD and PW - were involved in the same automobile accident. Thereafter, MD and PW both – incredibly - received VNG testing from the Fraudulent Macias Practice on February 11, 2020.

143.   Lifeline routinely provided VNG testing to multiple Insureds involved in the same accident at or about the same time as follows:

(i)   On September 18, 2019, two insureds - KB and WB - were involved in the same automobile accident. Thereafter, KB and WB both – incredibly - received VNG testing from Lifeline on November 12, 2019.

(ii)   On September 18, 2019, two insureds - JC and HL - were involved in the same automobile accident. Thereafter, JC and HL both – incredibly - received VNG testing from Lifeline on October 4, 2019.

(iii)   On July 6, 2019, two insureds - AP and RS - were involved in the same automobile accident. Thereafter, AP and RS both – incredibly - received VNG testing from Lifeline on October 3, 2019.

(iv)   On October 28, 2020, three insureds - TM, JS, and BS - were involved in the same mobile accident. Thereafter, TM, JS, and BS all – incredibly - received VNG testing from Lifeline on November 18, 2020.

(v)   On October 23, 2020, two insureds - AA and CL - were involved in the same automobile accident. Thereafter, AA and CL both – incredibly - received VNG testing from Lifeline on November 11, 2020.

(vi)   On October 3, 2020, two insureds - YY and DR - were involved in the same automobile accident. Thereafter, YY and DR both – incredibly - received VNG testing from Lifeline on October 7, 2020.

(vii)   On June 26, 2020, two insureds - NM and EV - were involved in the same automobile accident. Thereafter, NM and EV both – incredibly - received VNG testing from Lifeline on September 23, 2019.

(viii)   On July 15, 2019, two insureds - CJ and MW - were involved in the same automobile accident. Thereafter, CJ and MW both - incredibly- received VNG testing from Lifeline on December 18, 2019.

(ix)   On November 18, 2020, two insureds - EG and MM - were involved in the same automobile accident. Thereafter, EG and MM both – incredibly - received VNG testing from Lifeline on December 7, 2020.

(x)   On August 4, 2019, two insureds - DD and JW - were involved in the same automobile accident. Thereafter, DD and JW both - incredibly- received VNG testing from Lifeline on October 2, 2019.

144.   Amit Khaneja Neurology routinely provided VNG testing to multiple Insureds involved in the same accident at or about the same time as follows:

(i)     On April 7, 2020, three insureds - MB, AJ, and GW - were involved in the same automobile accident. Thereafter, MB, AJ, and GW all - incredibly - received VNG testing from Amit Khaneja Neurology April 21, 2020.

(ii)    On June 9, 2020, two insureds - WM and DF - were involved in the same automobile accident. Thereafter, WM and DF both - incredibly - received VNG testing from Amit Khaneja Neurology on July 1, 2020.

(iii)   On February 22, 2020, two insureds - SP and AP - were involved in the same automobile accident. Thereafter, SP and AP both - incredibly- received VNG testing from Amit Khaneja Neurology on April 23, 2020.

(iv)    On August 11, 2019, two insureds – RR and AG - were involved in the same automobile accident. Thereafter, RR and AG both – incredibly – received VNG testing from Amit Khaneja Neurology on April 1, 2020.

(v)     On February 17, 2020, two insureds - CB and DB - were involved in the same automobile accident. Thereafter, CB and DB both – incredibly – received VNG testing from Amit Khaneja Neurology on March 3, 2020.

(vi)    On February 26, 2020, two insureds - MM and AM - were involved in the same automobile accident. Thereafter, MM and AM both - incredibly - received VNG testing from Amit Khaneja Neurology on May 27, 2020.

(vii)   On March 17, 2020, two insureds - GVHC and ES - were involved in the same automobile accident. Thereafter, GVHC and ES both - incredibly - received VNG testing from Amit Khaneja Neurology on April 30, 2020.

(viii)  On May 6, 2020, three insureds - AP, JT, and ET - were involved in the same automobile accident. Thereafter, AP, JT, and ET all - incredibly - received VNG testing from Amit Khaneja Neurology on proximate days. AP received VNG testing on May 21, 2020, and JT and ET received VNG testing on May 27, 2020.

(ix)    On May 22, 2020, two insureds - KW and GA - were involved in the same automobile accident. Thereafter, KW and GA both - incredibly - received VNG from Amit Khaneja Neurology on June 10, 2020.

(x)     On February 22, 2020, two insureds - EJ and ROJ - were involved in the same automobile accident. Thereafter, EJ and ROJ both - incredibly - received VNG testing from Amit Khaneja Neurology on proximate days, May 6, 2020 and April 29, 2020, respectively.

145.    Hillside routinely provided VNG testing to multiple Insureds involved in the same accident at or about the same time as follows:

(i)     On October 20, 2020, two insureds - CM and SM - were involved in the same automobile accident. Thereafter, CM and SM both - incredibly - received VNG testing from Hillside on November 4, 2020.

(ii)    On May 25, 2020, two insureds - LR and BC - were involved in the same automobile accident. Thereafter, LR and BC both - incredibly - received VNG testing from Hillside on the October 14, 2020.

(iii)   On October 24, 2020, two insureds - MA and MT - were involved in the same automobile accident. Thereafter, MA and MT both - incredibly - received VNG testing from Hillside on November 11, 2020.

(iv)    On September 25, 2020, three insureds - FM, FM, and KM - were involved in the same automobile accident. Thereafter, FM, FM, and KM all - incredibly - received VNG testing from Hillside on October 23, 2020.

(v)     On October 16, 2020, two insureds - CA and VD - were involved in the same automobile accident. Thereafter, CA and VD both - incredibly - received VNG testing from Hillside on October 28, 2020.

(vi)    On September 3, 2020, two insureds - DH and TH - were involved in the same automobile accident. Thereafter, DH and TH both - incredibly - received VNG testing from Hillside on December 4, 2020.

(vii)   On September 2, 2020, two insureds - RJJ and DS - were involved in the same automobile accident. Thereafter, RJJ and DS both - incredibly - received VNG testing from Hillside on October 21, 2020.

(viii)  On June 22, 2020, two insureds - MD and SS - were involved in the same automobile accident. Thereafter, MD and SS both - incredibly - received VNG testing from Hillside on October 26, 2020.

(ix)    On November 12, 2020, two insureds - DS and SMS - were involved in the same automobile accident. Thereafter, DS and SMS both - incredibly - received VNG testing from Hillside on proximate days, December 1, 2020 and December 9, 2020, respectively.

(x)     On October 15, 2020, two insureds – MA and OF - were involved in the same automobile accident. Thereafter, MA and OF both - incredibly - received VNG testing from Hillside on proximate days, November 25, 2020 and November 11, 2020, respectively.

146.    These are only representative examples.  In many of the claims identified in

Exhibits "1"-"4", two or more Insureds involved in the same underlying accident received VNG

testing from the Provider Defendants at or about the same time, despite the fact that the Insureds were differently situated.

147.   Even if an Insured reported the existence of some general form of dizziness or balance disorder, the VNG tests that supposedly were provided by the Defendants were medically unnecessary because the cause of the Insured's dizziness or imbalance could be identified through the physical examinations that the Referring Providers routinely purported to provide, and the patient histories that they purported to take, during every initial examination/consultation and follow-up examination.

148.   Furthermore, because VNG tests properly are limited to circumstances in which the origin of a patient's vertigo is unclear, there is no legitimate reason to use VNG tests where – as in the case of every Insured who supposedly received VNG testing from the Defendants – the dizziness supposedly was caused by an automobile accident.

149.   Indeed, in virtually all the limited instances in which a patient complained of dizziness upon examination, the onset of symptoms was identified as the date of the automobile accident.

150.   In keeping with the fact that the VNG tests that supposedly were provided by the Defendants were medically unnecessary, upon information and belief no physician or healthcare provider associated with the Defendants properly prepared the Insureds for the tests or conducted any sort of pre-test evaluation or screening. This, in turn, rendered the data that the Defendants purported to obtain from the tests unreliable and useless.

151.   Because the Defendants knew the VNG tests were unreliable and useless, the data results that the Defendants purported to obtain from the tests was not incorporated into any Insured's treatment plan. Even when the VNG tests returned a positive result, the Insureds rarely,

if ever, underwent vestibular rehabilitation, balance retraining, or any other therapy to address their putative balance issues.

152.    In further keeping with the fact that the VNG tests were unreliable and useless, in many instances when the VNG tests returned inconclusive results, the Insureds did not undergo additional testing to generate conclusive results.

153.    In keeping with the fact that the VNG tests were medically unnecessary and administered pursuant to a predetermined fraudulent treatment protocol, virtually all the VNG reports contain pre-printed, boilerplate language, stating "patient c/o recurrent episodes of dizziness and headaches" even though virtually none of the patients who treated with the Provider Defendants actually complained of recurrent episodes of dizziness.

154.    In further keeping with the fact that the VNG tests were unreliable and useless, to the extent the Provider Defendants generated Infrared/Video ENG Reports as a result of the VNG tests, the Infrared/Video ENG Reports virtually always contained the following pre-printed boilerplate test results, regardless of which Provider Defendant performed the test:

> Oculomotor Tests:
> 1. Visual pursuit- Smooth accurate pursuit movements with normal gain.
> 2. Saccades - Normal peak velocity and normal delay.
> 3. Visual optokinetic Test - OPK nystagmus is rhythmic, with normal and symmetric waveform morphology.
> Gaze:
> 1. Spontaneous Nystagmus - not present.
> 2. Gaze Evoked Nystagmus - there was no nystagmus appears in any position of gaze.
> Rotational tests- Active head rotation tests (AHR) in the horizontal and vertical directions were within normal thresholds.
> Torsion Tests: - Normal waveform morphology.
> Positioning and Positional Subtests:
> Dix-Hallpikes (left, right): Negative for Hallpike findings and benign paroxysmal positioning vertigo (BPPV) diagnosis. No nystagmus evoked.
> Positional Tests: Positional testing was unremarkable in all head and body positions.
> Bithermal Caloric Tests: The responses to warm and cool caloric were without unilateral weakness bilaterally. Caloric fixation suppression was normal for all four irrigations.

155.    Similarly, and in further keeping with the fact that the VNG tests were unreliable and useless, to the extent the Provider Defendants generated Infrared/Video ENG Reports as a

result of the VNG tests, the Infrared/Video ENG Reports virtually always contained the following pre-printed boilerplate Summary and Impression, and Recommendations, regardless of which Provider Defendant performed the test:

> Summary and Impression: Of the test performed, normal VNG evaluation. No peripheral or central vestibular disorders noted. The variable history and clinical findings can be impaired by unspecified posttraumatic or psychogenic vertiginous disorder.
>
> Recommendations: Clinical correlation is suggested. Balance rehabilitation is recommended for symptomatic improvement if symptoms persist. The treatment plan may be designed for the pt to force the use of vestibular system input upon demand with habituation exercises.

156.    Moreover, despite that the reports virtually always recommend balance rehabilitation in the pre-printed recommendations, virtually none of the Insureds who received VNG testing with the Provider Defendants underwent balance rehabilitation.

157.    It is clear the VNG testing was purportedly rendered and then billed to GEICO pursuant to the Defendants' fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

**ii.     The Fraudulent Transcranial Doppler Testing**

158.    As with the VNG tests, the Defendants purported to subject many Insureds to medically unnecessary TDT.

159.    The charges for the TDT were fraudulent in that the transcranial doppler tests were medically unnecessary and were performed- to the extent they were performed at all- pursuant to fraudulent treatment protocols and illegal kickback and referral arrangements.

160.    The Provider Defendants then billed the TDT to GEICO under CPT 93886, 93890, and 93892 resulting in a charge of between $1,253.21 and $1,641.79 for each session of TDT they purported to provide.

(1) Legitimate Uses for TDT

44

161.    TDT is a noninvasive ultrasound technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.

162.    TDT typically uses a Doppler Transducer that enables recording of blood velocities from intracranial arteries through selected cranial foramina and thin regions of the skull.  Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

163.    TDT obtains information about the physiology of blood flow through the intracranial cerebrovascular system.

164.    Depending on the type of measurement needed, TDT studies can take at least 45 minutes, if not more.

165.    TDT evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

- Vasospasm, following a ruptured brain aneurysm

- Sickle cell anemia, to determine a patient's stroke risk

- Ischemic stroke

- Intracranial stenosis or blockage of the blood vessels

- Cerebral microemboli

- Patent Foramen Ovale, a hole in the heart that does not close properly after birth, which may provoke embolic stroke.

166.    The symptomology of the above-named conditions includes sudden severe headache with no known cause; numbness, weakness, or paralysis of the face, arm, leg, or one side of the body; confusion; trouble speaking, seeing, or walking; and/or sudden dizziness, loss of balance, or loss of coordination.

167.    Headaches, dizziness, and head trauma by themselves are not indications for TDT studies of the intracranial cerebrovascular system.

168.    Moreover, in the event the Insureds did suffer from any such symptoms, the onset of those symptoms was nether sudden nor unexplained but rather a purported result of the motor vehicle accidents that caused them to seek treatment at the No-Fault Clinics in the first instance.

169.    In a legitimate setting, if a medical doctor needs to examine a patient's intracranial blood flow he or she orders a magnetic resonance angiogram ("MR angiogram") or a computed tomography angiogram ("CT angiogram"), both of which measure intracranial blood flow with more accuracy than TDT.

170.    Indeed, there are virtually no clinical indications for TDT in an outpatient setting.

(2) The Defendants' Fraudulent TDT Charges

171.    As with the VNG testing, the Defendants did not perform independent evaluations on Insureds to determine if the TDT was medically necessary.

172.    Instead, the Defendants performed the TDT pursuant to referrals from the Referring Providers.

173.    In keeping with the fact that the TDT was performed pursuant to predetermined treatment protocols, the medical examinations performed by the Referring Providers often failed to screen for the symptoms that would warrant TDT.

174.    To the extent the Referring Providers conducted medical examinations that assessed the Insureds' head pain and neurological symptoms, in virtually all cases where the Defendants purported to provide TDT, the Insureds did not suffer any sort of injury as the result of the automobile accident that would warrant the TDT.

175.     Indeed, in keeping with the fact that that the TDT was medically useless and performed on a protocol basis rather than to benefit any of the Insureds, the diagnoses generated by the Referring Providers and listed on the Provider Defendants' billing to justify the TDT they administered to Insureds were often directly contradicted by the medical records generated by the Referring Providers.

176.     Despite virtually none of the Insureds who received TDT displaying symptoms warranting the testing, the Defendants submitted, or caused to be submitted, millions of dollars in bills for TDT to GEICO.

177.     Specifically, virtually none of the Insureds who received TDT at Lifeline reported suffering sudden or unexplained severe headaches, numbness or weakness, confusion, trouble speaking, seeing, or walking, and/or sudden dizziness, loss of balance, and/or coordination. For example:

(i)      On October 18, 2019, Insured DA was purportedly involved in a motor vehicle accident. On October 21, 2019, DA sought treatment with Metro Pain at the Avenue U Clinic with Dr. Elton. At that examination DA reported no head injury, headaches, dizziness, vertigo, tinnitus, or numbness in his extremities. DA's head, eyes, ears, nose and throat examination ("HEENT") was normal, and his gait, facial sensation and movement, speech, and judgment were intact. Nevertheless, on November 13, 2019, DA underwent TDT with Lifeline pursuant to a referral from Dr. Elton.

(ii)     On September 10, 2020, Insured MI was purportedly involved in a motor vehicle accident. On September 15, 2020, MI sought treatment with Metro Pain at 9016 Sutphin Boulevard, Jamaica, New York (the "Sutphin Boulevard Clinic") with Dr. Elton. At that examination MI reported no head injury, headaches, dizziness, vertigo, tinnitus, or numbness in his extremities. MI's HEENT was normal, and his gait, facial sensation and movement, speech, and judgment were intact. Nevertheless, on October 13, 2020, MI underwent TDT with Lifeline pursuant to a referral from Dr. Elton.

(iii)    On December 11, 2019, Insured AMQ was purportedly involved in a motor vehicle accident. On December 16, 2019, AMQ sought treatment with Metro Pain at the Avenue U Clinic with Dr. Elton. At that examination AMQ reported no head injury, headaches, dizziness, vertigo, tinnitus, or

numbness in his extremities. AMQ's HEENT was normal, and his gait, facial sensation and movement, speech, and judgment were intact. Nevertheless, on December 18, 2019, AMQ underwent TDT with Lifeline pursuant to a referral from Dr. Elton.

(iv)   On December 28, 2019, Insured DB was purportedly involved in a motor vehicle accident. On January 6, 2020, DB sought treatment with Metro Pain at the Avenue U Clinic with Dr. Elton. At that examination DB reported no headaches, dizziness, vertigo, tinnitus, or numbness or tingling in her extremities. DB's gait was intact, she was alert and oriented to person, place, and time, and her speech and judgment was intact. Nevertheless, on January 8, 2020, DB underwent TDT with Lifeline pursuant to a referral from Dr. Elton.

(v)   On December 28, 2019, Insured JC was purportedly involved in a motor vehicle accident. On January 6, 2020, JC sought treatment with Metro Pain at the Avenue U Clinic with Dr. Elton. At that examination JC reported no headache, dizziness, vertigo, tinnitus, or numbness or tingling in his extremities. JC's gait was intact, he was alert and oriented to person, place, and time, and his speech and judgment were intact. Nevertheless, on January 8, 2020, JC underwent TDT with Lifeline pursuant to a referral from Dr. Elton.

(vi)   On July 7, 2019, Insured JM was purportedly involved in a motor vehicle accident. On July 8, 2019, JM sought treatment with Metro Pain at the Avenue U Clinic with Dr. Greco. At that examination JM reported no headache dizziness, vertigo, tinnitus, or numbness or tingling in his extremities. JM's gait was intact, he was alert and oriented to person, place, and time, and his speech and judgment were intact. On September 23, 2019, JM underwent an additional examination with Dr. Elton of Metro Pain. At that examination JM reported no headache and no numbness or tingling in his extremities. Nevertheless, on September 25, 2019, JM underwent TDT with Lifeline pursuant to a referral from Dr. Elton.

(vii)   On October 7, 2019, Insured RHJ was purportedly involved in a motor vehicle accident. On November 25, 2019, RHJ sought treatment with Eastern Medical Practice at the West Merrick Road Clinic with Aleksandr Kopach, P.A. ("Kopach"). At that examination, RHJ reported no headaches, his gait was normal, he was alert and oriented to person, place and time, and his recent memory was intact. On December 23, 2019, RHJ underwent an additional examination with Kopach. At that examination, he again reported no headaches, his gait was normal, he was alert and oriented to person, place and time, and his recent memory was intact. Nevertheless, on January 2, 2020, RHJ underwent TDT with Lifeline pursuant to a referral from Kopach.

48

    (viii)   On July 14, 2019, Insured LM was purportedly involved in a motor vehicle accident. On July 22, 2019, LM sought treatment with Eastern Medical Practice at the West Merrick Road Clinic with Kopach. At that examination, LM reported no headaches, his gait was normal, he was alert and oriented to person, place and time, and his recent memory was intact. On September 16, 2019, LM underwent an additional examination Kopach. At that examination, he again reported no headaches, his gait was normal, he was alert and oriented to person, place and time, and his recent memory was intact. Nevertheless, on October 3, 2019, LM underwent TDT with Lifeline pursuant to a referral from Kopach.

    (ix)   On October 18, 2019, Insured MP was purportedly involved in a motor vehicle accident. On October 28, 2019, MP sought treatment with Syed Medical at a No-Fault Clinic located at 381 Rockaway Avenue, Brooklyn, New York (the "Rockaway Avenue Clinic") with Yakov Yakubov, P.A. ("Yakubov"). At that examination, MP reported no headache, head injury, or dizziness. MP was alert and oriented to time, person, and place and his gait was normal. On October 14, MP underwent an additional examination Yakubov. He again reported no headache, head injury, or dizziness. MP was alert and oriented to time, person, and place and his gait was normal. Nevertheless, on November 18, 2019, MP underwent TDT with Lifeline pursuant to a referral from Dr. Maqsood.

    (x)   On July 26, 2019, Insured DB was purportedly involved in a motor vehicle accident. On September 18, 2019, DB sought treatment with Tremont Medical at a No-Fault Clinic located at 205-16 Jamaica Avenue, Hollis, New York (the "205-16 Jamaica Avenue Clinic") with Dr. Sangavaram and Kwon Heoseun, F.N.P. ("Heoseun"). At that examination, DB reported no headaches, dizziness, or blurry vision. She was alert and oriented to person, place, and time. Her speech was fluent and coherent, and her gait was normal. Nevertheless, on October 2, 2019, DB underwent TDT with Lifeline pursuant to a referral from Dr. Sangavaram.

178.    As with Lifeline, virtually none of the Insureds who received TDT at the Fraudulent Macias Practice reported suffering sudden or unexplained severe headaches, numbness or weakness, confusion, trouble speaking, seeing, or walking, and/or sudden dizziness, loss of balance, and/or coordination. For example:

    (i)   On October 30, 2019, Insured YP was purportedly involved in a motor vehicle accident. On November 6, 2019, YP sought treatment with RAF Sports Chiropractic, P.C. ("RAF Sports Chiro") at the Avenue V Clinic with Tracy Ann Kieber, D.C. ("Dr. Kieber"). At that examination, YP reported no headaches or dizziness. On November 13, 2019, YP sought treatment with Health East Medical Alliance, P.C. ("Health East Medical") at the

Avenue V Clinic with David Suarez, M.D. ("Dr. Suarez"). At that examination YP reported no headaches, numbness or tingling in his extremities, and he was alert and oriented to person, place, and time. Nevertheless, on November 26, 2019, YP underwent TDT with the Fraudulent Macias Practice.

(ii) On February 1, 2020, Insured KB was purportedly involved in a motor vehicle accident. On February 20, 2020, KB sought treatment with Glendridge Chiro at the Linden Boulevard Clinic with Dr. Noberini. At that examination, KB reported no headache, dizziness, vertigo, tinnitus, blurred vision, or numbness or tingling in his extremities. On February 20, 2020, KB sought treatment with Metro Pain at the Linden Boulevard Clinic with Dr. Elton, at which KB reported no headaches, dizziness, vertigo, tinnitus, or numbness or tingling in his extremities. Nevertheless, on February 25, 2020, KB underwent TDT with the Fraudulent Macias Practice.

(iii) On November 18, 2019, Insured NC was purportedly involved in a motor vehicle accident. On December 2, 2019, NC sought treatment with Glenridge Chiro at the Linden Boulevard Clinic with Dr. Noberini. At that examination, NC reported no headache, dizziness, vertigo, tinnitus, blurred vision, or numbness or tingling in his extremities. On December 3, 2019, NC sought treatment with Metro Pain at the Linden Boulevard Clinic with Dr. Kim. At that examination, NC reported no headache, dizziness, vertigo, tinnitus, numbness in his extremities, and he was alert and oriented to person, place and time. On December 16, 2019, NC underwent a follow up examination with Glenridge Chiro at the Linden Boulevard Clinic with Dr. Noberini. At that examination, no inquiry was made into whether NC was experiencing headaches, dizziness, vertigo, tinnitus, blurred vision, or numbness or tingling in his extremities. On January 7, 2020, NC underwent another examination with Metro Pain at the Linden Boulevard Clinic with Dr. Kim, at which NC reported no headaches. On January 7, 2020, NC underwent an examination with Dr. Matrangolo at the Linden Boulevard Clinic, at which he reported headaches but no dizziness, blurred vision, or history of strokes, and his gait was not ataxic. On January 13, 2020, NC underwent a medical examination with Metro Pain at the Linden Boulevard Clinic with Camari Wallace, M.D. ("Dr. Wallace"), at which NC reported no headache, vertigo, tinnitus, balance problems, or stroke. Nevertheless, on January 20, 2020, NC underwent TDT with the Fraudulent Macias Practice.

(iv) On December 8, 2019, Insured LO was purportedly involved in a motor vehicle accident. On December 11, 2019, LO sought treatment with Glenridge Chiro at the Linden Boulevard Clinic with Dr. Noberini. At that examination, LO reported no headaches, dizziness, vertigo, tinnitus, blurred vision, or numbness in his extremities. On December 12, 2020, LO sought treatment with Metro Pain at the Linden Boulevard Clinic with Dr. Kim. At that examination, he reported no headache, dizziness, vertigo, or tinnitus

and was alert and oriented to person place and time. On January 14, 2020, LO underwent an additional examination at Metro Pain with Dr. Kim, at which he reported no headaches. On January 16, 2020, LO underwent an additional examination at Glenridge Chiro with Dr. Noberini, at which he reported no tingling or numbness in his extremities. Nevertheless, on January 20, 2020 LO underwent TDT with the Fraudulent Macias Practice.

(v)     On November 12, 2019, Insured SPL was purportedly involved in a motor vehicle accident. On November 13, 2020, SPL sought treatment with Glenridge Chiro at the Linden Boulevard Clinic with Dr. Noberini. At that examination, SPL reported no headaches, dizziness, vertigo, tinnitus, blurred vision, or numbness in her extremities. On November 14, 2019, SPL sought treatment with Metro Pain at the Linden Boulevard Clinic with Dr. Kim. At that examination SPL reported no headache, dizziness, vertigo, or tinnitus, and was alert and oriented to person place and time. On November 17, 2019, SPL underwent an examination with Mark Rybstein, M.D. ("Dr. Rybstein") at MKR Medical, P.C. ("MKR Medical") at 5 Addison Place, Valley Stream, New York. At that examination she reported no head injury, or headaches. On December 4, 2019 and January 6, 2020, SPL underwent an additional examination with Glenridge Chiro at the Linden Boulevard Clinic with Dr. Noberini, at which she reported no tingling or numbness in her extremities. Nevertheless, on January 13, 2020, SPL underwent TDT with the Fraudulent Macias Practice.

(vi)    On February 5, 2020, Insured MS was purportedly involved in a motor vehicle accident. On February 10, 2020, MS sought treatment with Joseph Brogna, D.C. ("Dr. Brogna") at 176 Wilson Place, Brooklyn, New York (the "Wilson Place Clinic"). At that examination he reported no headaches or head injury. On February 10, 2020, MS Sought treatment with Sudha P. Patel, M.D. ("Dr. Patel") at the Wilson Place Clinic. At that examination, he reported no headache, dizziness, or blurred vision. On March 9, 2020, MS sought treatment with Dr. Patel at the Wilson Place Clinic. At that examination, MS reported no headache, dizziness, blurred, vision, or weakness or numbness in his extremities, and his gait was normal. Nevertheless, on March 17, 2020, MS underwent TDT with the Fraudulent Macias Practice.

(vii)   On January 18, 2020, Insured FS was purportedly involved in a motor vehicle accident. On February 5, 2020, FS sought treatment with Corona Family Chiro at the Boston Road Clinic with Bret Jenkins, D.C. ("Dr. Jenkins"). At that examination, FS reported no headache, dizziness, vertigo, or tinnitus, and experienced no numbness or tingling in his extremities. On February 10, 2020, FS sought treatment with Bronx County Medical at the Boston Road Clinic with Dr. Barakat, at which he reported no headache, dizziness, vertigo, or tinnitus. Nevertheless, on February 25, 2020, FS underwent TDT with the Fraudulent Macias Practice.

(viii)   On February 5, 2020, Insured NS was purportedly involved in a motor vehicle accident. On February 10, 2020, NS sought treatment with NY Chiropractic Rehabilitation, P.C. ("NY Chiro") at the Avenue V Clinic with William Cooper, D.C. ("Dr. Cooper"). At that examination, NS reported no headaches or numbness in her extremities and her gait was within normal limits. Nevertheless, on February 24, 2020, NS underwent TDT with the Fraudulent Macias Practice.

179.   As with Lifeline and the Fraudulent Macias Practice, virtually none of the Insureds who received TDT from Amit Khaneja Neurology or Hillside reported experiencing symptoms that would warrant TDT.  For example:

(i)   On November 24, 2019, Insured NB was purportedly involved in a motor vehicle accident. On December 4, 2019, NB sought treatment with Dr. Striano at a No-Fault Clinic located at 665 Pelham Parkway North, Bronx, New York (the "665 Pelham Parkway Clinic") with Melissa DeTullilo, D.C. ("Dr. DeTullilo"). At that examination, NB reported no head injury or head pain. Nevertheless, on July 6, 2020, NB underwent TDT with Amit Khaneja Neurology at the 665 Pelham Parkway Clinic pursuant to a Neurological Referral Form from Dr. Striano.

(ii)   On March 17, 2020, Insured UW was purportedly involved in a motor vehicle accident. On March 18, 2020, UW sought treatment with Rutland Medical, P.C. ("Rutland Medical") at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York (the "South Central Avenue Clinic") with Beena Ghazal, P.A. ("Ghazal"). At that examination, UW reported no headaches, numbness or tingling in her extremities. UW was alert and oriented, her memory was intact and her speech was fluent and coherent. On March 24, 2020, UW sought treatment with Metro Pain at the Linden Boulevard Clinic with Dr. Kim. At that examination, UW reported no head injury, headaches, dizziness, vertigo, tinnitus, or blurred vision, and her gait was normal. On March 24, 2020, UW also sought treatment with Glenridge Chiro at the Linden Boulevard Clinic with Dr. Noberini. At that examination, she reported no headaches, dizziness, vertigo, tinnitus, blurred vision or diminished sensation in her extremities. Nevertheless, on March 31, 2020, UW underwent TDT with Amit Khaneja Neurology.

(iii)   On April 7, 2020, Insured GW was purportedly involved in a motor vehicle accident. On April 8, 2020, GW sought treatment with Bronx County Medical at the Boston Road Clinic with Dr. Barakat. At that examination, he reported no head injury, headaches, dizziness, vertigo, or blurred vision. He was alert and oriented to person, time and place, and his short and long term memory were normal. On April 9, 2020, GW sought treatment with Corona Family Chiro at the Boston Road Clinic with Dr. Simakovsky. At

that examination, GW reported no headaches. Nevertheless, on April 21, 2020, GW underwent TDT with Amit Khaneja Neurology.

(iv)     On May 11, 2020, Insured AD was purportedly involved in a motor vehicle accident. On May 14, 2020, AD sought treatment with the Raia P.C. at the Metropolitan Avenue Clinic with Dr. Kenworthy. At that examination, AD reported no headaches, dizziness, vertigo, tinnitus, blurred vision, or ataxia. The Romberg Test performed on AD was negative. Nevertheless, on May 26, 2020, AD underwent TDT with Amit Khaneja Neurology pursuant to a referral from M. Gadaborshev, with whom it appears he did not treat at any time between May 11, 2020 and May 26, 2020.

(v)      On April 18, 2020, Insured DR was purportedly involved in a motor vehicle accident. On May 6, 2020, DR sought treatment with BSS Metropolitan Medical PC d/b/a Bhupinder Sing Sawhney (the "Sawhney P.C.") at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York (the "Grand Concourse Clinic") with Bhupinder Sawhney M.D. ("Dr. Sawhney"). At that examination, DR reported no head injury or headaches, his gait, speech, and judgment were intact, and he was alert and oriented to person, place, and time. Dr. Sawhney did not make any observations whether DR was experiencing dizziness, vertigo, tinnitus, or decreased sensation in his extremities. Nevertheless, on May 20, 2020, DR underwent TDT with Amit Khaneja Neurology pursuant to a Neurological Referral Form from Dr. Sayyed with whom it appears he did not treat at any time between April 18, 2020 and May 20, 2020.

(vi)     On June 26, 2020, Insured RH was purportedly involved in a motor vehicle accident. On June 29, 2020, RH sought treatment with Focused Chiropractic Health & Wellness, P.C. ("Focused Chiro") at a No-Fault Clinic located at 108-25 Merrick Boulevard, Jamaica, New York (the "Merrick Boulevard Clinic") with Roland Rose, D.C. ("Dr. Rose"). At that examination RH reported no headaches and exhibited no balance or coordination deficits. Nevertheless, on July 8, 2020, RH underwent TDT with Amit Khaneja Neurology pursuant to a Neurological Referral Form from Dr. Rose.

(vii)    On June 24, 2020, Insured NF was purportedly involved in a motor vehicle accident. On July 7, 2020, NF sought treatment with Focused Chiro at the Merrick Boulevard Clinic with Dr. Rose. At that examination NF reported no headaches and exhibited no balance or coordination deficits. Nevertheless, on July 8, 2020, NF underwent TDT with Amit Khaneja Neurology pursuant to a Neurological Referral Form from Dr. Rose.

(viii)   On March 27, 2020, Insured TS was purportedly involved in a motor vehicle accident. On April 15, 2020, TS sought treatment with Metro Pain at a No-Fault Clinic located at 146 Empire Boulevard, Brooklyn, New York (the "Empire Boulevard Clinic") with Dr. Wallace. At that examination, he reported no headache, dizziness, vertigo, or tinnitus and he was alert and

oriented to person, place and time. On April 16, 2020, TS sought treatment with Light Touch Chiropractic, P.C. ("Light Touch Chiro") at the Empire Boulevard Clinic with Anthony Vigorito, D.C. ("Dr. Vigorito"). At that examination, TS reported no headaches or dizziness. Nevertheless, on May 7, 2020, TS underwent TDT with Amit Khaneja Neurology.

(ix) On April 14, 2020, Insured DJ was purportedly involved in a motor vehicle accident. On May 14, 2020, DJ sought treatment with Alexander Baldonado, M.D. ("Dr. Baldonado") at the 76th Street Clinic. At that examination, DJ reported no headaches, dizziness, vertigo, or blurred vision and was alert and oriented to person, place and time. On May 19, 2020, DJ sought treatment with Reliance Chiropractic, P.C. ("Reliance Chiro") at the 76th Street Clinic with Oleg Borisov, D.C. ("Dr. Borisov"). At that examination, DJ reported no headaches, dizziness, visual disturbances, or stroke. Nevertheless, on June 24, 2020, DJ underwent TDT with Amit Khaneja Neurology pursuant to a referral from Dr. Pak with whom it appears he did not treat at any time between April 14, 2020 and June 24, 2020.

(x) On April 26, 2020, Insured AT was purportedly involved in a motor vehicle accident. On April 30, 2020, AT sought treatment with Macintosh Medical, P.C. ("Macintosh Medical") at a No-Fault Clinic located at 513 Church Avenue, Brooklyn, New York (the "513 Church Avenue Clinic") with Claudia Geris, P.A. ("Geris"). At that examination, he reported infrequent headaches, denied experiencing trouble with his memory, trouble concentrating, poor coordination or loss of strength and his gait was normal. At that examination, he was oriented to person, place, and time, and his recent memory was intact. Nevertheless, on May 14, 2020, AT underwent TDT with Amit Khaneja Neurology pursuant to a Neurological Referral Form from Dr. Etienne.

(xi) On November 11, 2020, Insured CO was purportedly involved in a motor vehicle accident. On November 18, 2020, CO sought treatment with the Pak Hong Sik P.C., at a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, New York (the "1100 Pelham Parkway Clinic") and underwent an examination with Dr. Pak. At that examination, CO reported no head injury, headaches, dizziness, or vertigo. His gait was observed to be intact, his HEENT examination was normal, he was alert and oriented to person, place, and time, and his memory, speech, and judgment were intact. Nevertheless, on December 15, 2020, CO underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Pak which did not indicate what testing Hillside should perform.

(xii) On October 12, 2020, Insured TF was purportedly involved in a motor vehicle accident. On October 13, 2020, TF sought treatment with Cross County Chiro at the 99th Street Clinic with Dr. Whitney. At that examination, TF reported no headaches, dizziness, vertigo, tinnitus, blurred

vision or numbness in her extremities. The Romberg Test performed on TF was negative. On November 2, 2020, TF underwent an additional examination with Cross County Chiro at the 99th Street Clinic with Dr. Whitney, at which her Romberg test was negative. Nevertheless, on November 2, 2020, TF underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Whitney, which did not indicate what testing Hillside should perform. Thereafter, on November 16, 2020, TF again underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Whitney which again did not indicate what testing Hillside should perform. TF did not undergo a follow up examination with Dr. Whitney between November 2, 2020 and November 16, 2020.

(xiii)   On February 18, 2020, Insured CC was purportedly involved in a motor vehicle accident. On February 19, 2020, CC sought treatment with Metro Pain at a No-Fault Clinic located at 1767 Southern Boulevard, Bronx, New York (the "1767 Southern Boulevard Clinic") with Theodros Seyoum, M.D. ("Dr. Seyoum"). At that examination, CC reported no head injury, headaches, dizziness, vertigo, or numbness in her extremities, and her gait was observed to be intact. Thereafter on April 23, 2020, May 21, 2020, June 18, 2020, and July 16, 2020, CC underwent follow-up examinations with Metro Pain at the 1767 Southern Boulevard Clinic with Dr. Alleyne. At those examinations, CC reported no headaches. Nevertheless, on November 11, 2020, CC underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Alleyne that was dated November 12, 2020.

(xiv)   On November 19, 2020, Insured JB was purportedly involved in a motor vehicle accident. On November 23, 2020, JB sought treatment with Metro Pain at a No-Fault Clinic located at 10510 Flatlands Avenue, Brooklyn, New York (the "Flatlands Avenue Clinic") with Hyelong Lim, N.P. ("Lim"). At that examination, JB reported no head injury, headache, dizziness, vertigo, or numbness or tingling in his extremities. He was alert and oriented to person, place, and time, and his speech was intact. Nevertheless, on December 9, 2020, JB underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Alleyne.

(xv)   On October 4, 2020, Insured HC was purportedly involved in a motor vehicle accident. On October 9, 2020, HC sought treatment with Corona Family Chiro at the Boston Road Clinic and underwent an examination with Leero Raimundo, D.C. ("Dr. Raimundo"). At that examination, HC reported no headaches, dizziness, or vertigo. On November 11, 2020, HC underwent a follow up examination with Corona Family Chiro at the Boston Road Clinic at which HC reported no numbness or tingling in her extremities. On December 2, 2020, HC underwent an additional follow up examination with Corona Family Chiro at the Boston Road Clinic at which HC reported tingling in her left hand. Nevertheless, on December 28, 2020, HC underwent TDT with Hillside pursuant to a Neurological Referral Form

from Dr. Whitney which did not indicate what testing Hillside should perform.

(xvi)    On October 27, 2020, Insured AR was purportedly involved in a motor vehicle accident. On December 2, 2020, AR sought treatment with Metro Pain at the Rockaway Avenue Clinic with Patricia Kelly, M.D. ("Dr. Kelly"). At that examination, AR reported no headache, dizziness, vertigo, tinnitus, or numbness in his extremities and he was alert and oriented to person, place, and time. Nevertheless, on December 15, 2020, AR underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Kelly.

(xvii)   On October 12, 2020, Insured KC was purportedly involved in a motor vehicle accident. On October 15, 2020, KC sought treatment with Metro Pain at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York (the "Hillside Avenue Clinic") with Dr. Kelly. At that examination, KC reported no headache, dizziness, vertigo, or numbness in his extremities and he was oriented to person, place, and time. On November 17, 2020, KC underwent an additional examination with Dr. Kelly at which he reported no headache. On November 25, 2020, KC underwent an additional examination with Metro Pain at the Hillside Avenue Clinic with Dr. Wallace at which he again reported no headaches, vertigo, change in vision, strokes, or balance problems. Nevertheless, on December 7, 2020, KC underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Kelly that did not indicate what testing Hillside should perform.

(xviii)  On November 23, 2020, Insured AR was purportedly involved in a motor vehicle accident. On December 1, 2020, AR sought treatment with the Raia P.C. at a No-Fault Clinic located at 89-25 130th Street, Richmond Hill, New York (the "130th Street Clinic") with Dr. Gibbons. At that examination, AR reported no headaches, dizziness, vertigo, tinnitus, or blurred vision. AR exhibited no ataxia and her gait was normal. On December 3, 2020, AR sought treatment with Roosevelt Family Chiropractic, P.C. ("Roosevelt Family Chiro") at the 130th Street Clinic with Mehrzad Kohansieh, D.C. ("Dr. Kohansieh"). At that examination, AR reported no headaches. Nevertheless, on December 21, 2020, AR underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Strauss. It does not appear that AR was ever examined or treated by Dr. Strauss.

(xix)    On October 1, 2020, Insured MM was purportedly involved in a motor vehicle accident. On October 6, 2020, MM sought treatment with the Pak Hong Sik P.C. at the Empire Boulevard Clinic with Dr. Pak. At that examination, he reported no head injury, headache, dizziness, or vertigo. His gait was intact, and he was alert and oriented to person, place, and time. Nevertheless, on October 19, 2020, MM underwent TDT with Hillside pursuant to a Neurological Referral Form from Dr. Pak.

180.    Moreover, as with VNG testing, it is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident would routinely require TDT at or about the same time.

181.    Even so, and in keeping with the fact that the TDT purportedly performed by the Defendants was not medically necessary and was performed pursuant to predetermined protocols to maximize profits, the Fraudulent Macias Practice routinely provided TDT to multiple Insureds involved in the same accident at or about the same time. For example:

(i)     On March 17, 2020, two insureds – GB and RG – were involved in the same automobile accident.  Thereafter, GB and RG both – incredibly – received TDT from the Fraudulent Macias Practice on March 26, 2020.

(ii)    On January 14, 2020, two insureds - JA and RH - were involved in the same automobile accident. Thereafter, JA and RH both - incredibly- received TDT from the Fraudulent Macias Practice on January 28, 2020.

(iii)   On February 14, 2020, two insureds - HS and SS - were involved in the same automobile accident. Thereafter, HS and SS both - incredibly- received TDT from the Fraudulent Macias Practice on February 24, 2020.

(iv)    On June 8, 2019, two insureds - CP and MK - were involved in the same automobile accident. Thereafter, CP and MK both - incredibly- received TDT from the Fraudulent Macias Practice on December 17, 2019.

(v)     On November 28, 2019, two insureds - JJ and LRM - were involved in the same automobile accident. Thereafter, JJ and LRM both - incredibly- received TDT from the Fraudulent Macias Practice on December 17, 2019.

(vi)    On November 29, 2019, two insureds - JA and GC - were involved in the same automobile accident. Thereafter, JA and GC both - incredibly- received TDT from the Fraudulent Macias Practice on February 3, 2020.

(vii)   On December 3, 2019, two insureds - NG and JPG - were involved in the same automobile accident. Thereafter, NG and JPG both - incredibly- received TDT from the Fraudulent Macias Practice on March 10, 2020.

(viii)  On August 28, 2019, two insureds - AE and ME - were involved in the same automobile accident. Thereafter, AE and ME both - incredibly- received TDT from the Fraudulent Macias Practice on November 20, 2019.

(ix)     On December 16, 2019, two insureds – NCB and MM - were involved in the same automobile accident. Thereafter, NCB and MM both - incredibly-received TDT from the Fraudulent Macias Practice on January 7, 2020.

(x)      On December 18, 2019, two insureds – AO and FO - were involved in the same automobile accident. Thereafter, AO and FO both - incredibly - received TDT testing from the Fraudulent Macias Practice on December 26, 2019.

182.    Lifeline routinely provided TDT to multiple Insureds involved in the same accident

at or about the same time. For example:

(i)      On July 4, 2020, two insureds – DT and DT - were involved in the same automobile accident. Thereafter, DT and DT both - incredibly - received TDT from Lifeline on August 28, 2020.

(ii)     On January 3, 2020  two insureds - BF and ZF - were involved in the same automobile accident. Thereafter, BF and ZF both - incredibly - received TDT from Lifeline on January 9, 2020.

(iii)    On August 8, 2020, three insureds - HP, MP, and RR - were involved in the same automobile accident. Thereafter, HP, MP, and RR all - incredibly-received TDT from Lifeline on September 9, 2020.

(iv)     On July 9, 2020, three insureds - GC, MG, and SH - were involved in the same automobile accident. Thereafter, GC, MG, and SH all - incredibly-received TDT from Lifeline on September 3, 2020.

(v)      On October 30, 2020 two insureds - CP and EVP - were involved in the same automobile accident. Thereafter, CP and EVP both - incredibly-received TDT from Lifeline on November 11, 2020.

(vi)     On July 9, 2020 two insureds – AC and BR - were involved in the same automobile accident. Thereafter, AC and BR both – incredibly - received TDT from Lifeline on August 26, 2020.

(vii)    On December 13, 2019,  two insureds - ST and YT - were involved in the same automobile accident. Thereafter, ST and YT both - incredibly-received TDT from Lifeline on January 7, 2020.

(viii)   On August 24, 2019, two insureds - EC and EC - were involved in the same automobile accident. Thereafter, EC and EC both – incredibly - received TDT from Lifeline on September 25, 2019.

(ix)     On December 20, 2019, two insureds – SF and LH - were involved in the same automobile accident. Thereafter, SF and LH both – incredibly - received TDT from Lifeline on January 2, 2020.

    (x)    On November 6, 2020, two insureds – RSC and SV - were involved in the same automobile accident. Thereafter, RSC and SV both – incredibly - received TDT from Lifeline on November 11, 2020.

183.    Amit Khaneja Neurology routinely provided TDT to multiple Insureds involved in the same accident at or about the same time. For example:

    (i)    On March 27, 2020, two insureds - TS and DS - were involved in the same automobile accident. Thereafter, TS and DS both - incredibly- received TDT from Amit Khaneja Neurology on May 7, 2020.

    (ii)    On March 13, 2020, two insureds – PM and AB - were involved in the same automobile accident. Thereafter, PM and AB both - incredibly- received TDT from Amit Khaneja Neurology on May 19, 2020.

    (iii)    On March 17, 2020, two insureds - JAW and UW - were involved in the same automobile accident. Thereafter, JAW and UW both - incredibly- received TDT from Amit Khaneja Neurology on March 31, 2020.

    (iv)    On February 23, 2020, two insureds - CH and JA - were involved in the same automobile accident. Thereafter, CH and JA both - incredibly- received TDT from Amit Khaneja Neurology on May 20, 2020.

    (v)    On February 24, 2020, two insureds - LA and AF - were involved in the same automobile accident. Thereafter, LA and AF both - incredibly- received TDT from Amit Khaneja Neurology on May 7, 2020.

    (vi)    On November 26, 2019, two insureds - MH and AA - were involved in the same automobile accident. Thereafter, MH and AA both - incredibly- received TDT from Amit Khaneja Neurology on proximate dates, February 13, 2020 and February 25, 2020, respectively.

    (vii)    On August 7, 2019, two insureds - SW and AM - were involved in the same automobile accident. Thereafter, SW and AM both - incredibly- received TDT from Amit Khaneja Neurology on proximate dates, May 14, 2020 and May 26, 2020, respectively.

    (viii)    On April 16, 2020, two insureds - JJ and AP - were involved in the same automobile accident. Thereafter, JJ and AP both - incredibly- received TDT from Amit Khaneja Neurology on proximate dates, April 28, 2020 and May 7, 2020, respectively.

    (ix)    On May 25, 2020, two insureds - PV and TV - were involved in the same automobile accident. Thereafter, PV and TV both - incredibly- received TDT from Amit Khaneja Neurology on proximate dates, June 24, 2020 and June 10, 2020, respectively.

(x)     On December 16, 2019, two insureds - DM and DM - were involved in the same automobile accident. Thereafter, DM and DM both - incredibly- received TDT testing from Amit Khaneja Neurology on proximate days, March 31, 2020 and March 24, 2020, respectively.

184.    Hillside  routinely provided TDT to multiple Insureds involved in the same accident at or about the same time. For example:

(i)     On October 22, 2020, two insureds – TP and TP - were involved in the same automobile accident. Thereafter, TP and TP both - incredibly- received TDT from Hillside on December 1, 2020.

(ii)    On September 19, 2020, two insureds – JM and CM - were involved in the same automobile accident. Thereafter, JM and CM both - incredibly- received TDT from Hillside on November 19, 2020.

(iii)   On July 5, 2020, two insureds - ORC and JFDR - were involved in the same automobile accident. Thereafter, ORC and JFDR both - incredibly- received TDT from Hillside on November 9, 2020.

(iv)    On September 30, 2020, two insureds – MR and KB - were involved in the same automobile accident. Thereafter, MR and KB both - incredibly- received TDT from Hillside on November 11, 2020.

(v)     On November 29, 2020, two insureds – RB and MR - were involved in the same automobile accident. Thereafter, RB and MR both - incredibly- received TDT from Hillside on December 2, 2020.

(vi)    On May 10, 2020, two insureds – JM and AC - were involved in the same automobile accident. Thereafter, JM and AC both - incredibly- received TDT from Hillside on December 15, 2020.

(vii)   On July 11, 2020, two insureds – DB and TB - were involved in the same automobile accident. Thereafter, DB and TB both - incredibly- received TDT from Hillside on October 19, 2020.

(viii)  On November 8, 2020, two insureds – JA and SL - were involved in the same automobile accident. Thereafter, JA and SL both - incredibly- received TDT from Hillside on November 24, 2020.

(ix)    On December 17, 2020, two insureds - CJ and DJ - were involved in the same automobile accident. Thereafter, CJ and DJ both - incredibly- received TDT from Hillside on December 30, 2020.

(x)     On August 16, 2020, two insureds - VC and LN - were involved in the same automobile accident. Thereafter, VC and LN both - incredibly- received

TDT from Hillside on proximate dates, October 27, 2020 and November 2, 2020, respectively.

185.    These are only representative examples.  In many of the claims identified in Exhibits "1"-"4", two or more Insureds involved in the same underlying accident received TDT from the Provider Defendants at or about the same time, despite the fact that the Insureds were differently situated.

186.    As with the other Fraudulent Services, the TDT was rendered and billed pursuant to the Defendants' fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

187.    Indeed, even had the Insureds displayed symptoms warranting TDT, in a legitimate clinical setting the practitioner would initially administer a transcranial doppler study of the intracranial arteries, billed under CPT 93886, and would only proceed to perform a vasoreactivity test, billed under CPT 93890, or a microemboli study, billed under CPT 93892 if the Insured displayed symptomology warranting that additional testing. Nevertheless, the Provider Defendants purported to provide all three studies on very Insured who received TDT.

188.    In keeping with the fact that the Fraudulent Services were unreliable and useless, to the extent the Fraudulent Macias Practice, Lifeline, or Amit Khaneja Neurology generated a "TCD Conclusion" as a result of the TDT, the TCD Conclusion virtually always contained the same pre-printed boilerplate test results, regardless of whether the Fraudulent Macias Practice, Lifeline, or Amit Khaneja Neurology performed the testing:

---

**TCD Conclusion:**

Normal study with adequate functional reserve testing (VMR).
No evidence of high intensity transient signals (micro-emboli).

This study confirms the patency of the major basal intracranial arteries of the Circle of Willis. There is no evidence of intracranial stenosis or occlusive disease. TCD is not sensitive for tumors, aneurysms, and small AVM's.

189.    In further keeping with the fact that the TDT results were unreliable and useless, the data generated as a result of the TDT appear to have been fabricated.

190.    Specifically, the TDT performed by the Provider Defendants generated "TCD Exam Data", an example of which is contained below:

**TCD Exam Data:**
(In the report, the unit of Peak/Mean/Dias is cm/s, Depth's unit is mm, others have no unit)

| Vessel | Depth | Peak | Mean | Dias | PI | RI | SBI | S/D | HR | DIR |
|---|---|---|---|---|---|---|---|---|---|---|
| RMCA | 52 | 59 | 40 | 31 | 0 69 | 0.47 | 0 06 | 1.90 | 80 | Toward |
| RACA | 62 | 70 | 49 | 38 | 0 66 | 0.46 | 0.31 | 1.84 | 80 | Reverse |
| RPCA | 67 | 71 | 46 | 33 | 0 83 | 0 54 | 0 50 | 2.15 | 71 | Toward |
| LMCA | 52 | 71 | 47 | 35 | 0 77 | 0 51 | 0.11 | 2.03 | 81 | Toward |
| LACA | 62 | 65 | 44 | 34 | 0 70 | 0.48 | 0.33 | 1.91 | 96 | Reverse |
| LPCA | 67 | 60 | 43 | 34 | 0 61 | 0.43 | 0.10 | 1 76 | 66 | Toward |
| ROA | 47 | 23 | 14 | 9 | 1.02 | 0 61 | 0.43 | 2 56 | 122 | Toward |
| LOA | 47 | 24 | 15 | 10 | 0.95 | 0 58 | 0.97 | 2 40 | 125 | Toward |
| RVA | 62 | 52 | 35 | 27 | 0.71 | 0 48 | 0.67 | 1 93 | 105 | Reverse |
| LVA | 62 | 48 | 29 | 20 | 0.95 | 0 58 | 0.63 | 2.40 | 122 | Reverse |
| BA | 75 | 49 | 30 | 21 | 0.92 | 0.57 | 0 02 | 2 33 | 132 | Reverse |
| vmr pre | 52 | 64 | 44 | 34 | 0.68 | 0.47 | 0 46 | 1.88 | 72 | Toward |
| vmr hold | 52 | 55 | 36 | 27 | 0 77 | 0.51 | 0 05 | 2 04 | 65 | Toward |
| vmr after | 52 | 71 | 46 | 34 | 0 80 | 0 52 | 0.49 | 2.09 | 81 | Toward |
| hits | 52 | 61 | 42 | 32 | 0 70 | 0 48 | 0 04 | 1.91 | 80 | Toward |

191.    The "depth" measurement contained in the "TCD Exam Data" purports to measure the size of each Insured's head, as well as the location of blood vessels therein.

192.    However, virtually all Insureds who underwent TDT with the Provider Defendants purportedly had one of four sets of depth measurements, with the majority presenting with identical depth measurements. In other words, according to the TCD Exam Data generated by the Provider Defendants, the majority of Insureds who treated with the Provider Defendants had identically sized heads with identically located blood vessels. For example:

(i)      On October 11, 2019, an Insured named TA was involved in an automobile accident. On May 5, 2020, TA received TDT from the Fraudulent Macias Practice. As a result of that TDT, the Fraudulent Macias Practice generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(ii)     On October 3, 2019, an Insured named AT was involved in a motor vehicle accident. On December 19, 2019, AT received TDT from the Fraudulent Macias Practice. As a result of that TDT, the Fraudulent Macias Practice generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(iii)    On July 20, 2019, an Insured named MAA was involved in a motor vehicle accident. On September 4, 2019, MAA received TDT from the Fraudulent Macias Practice. As a result of that TDT, the Fraudulent Macias Practice generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(iv)    On July 16, 2019, an Insured named KLB was involved in a motor vehicle accident. On October 2, 2019, KLB received TDT from Lifeline. As a result of that TDT, Lifeline generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(v)     On September 4, 2020, an Insured named FA was involved in a motor vehicle accident. On September 23, 2020, FA received TDT from Lifeline. As a result of that TDT, Lifeline generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(vi)    On September 4, 2019, an Insured named EO was involved in a motor vehicle accident. On September 25, 2019, EO received TDT from Lifeline. As a result of that TDT, Lifeline generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(vii)   On June 27, 2020, an Insured named LA was involved in a motor vehicle accident. On July 9, 2020, LA received TDT from Amit Khaneja Neurology. As a result of that TDT, Amit Khaneja Neurology generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(viii)  On July 11, 2019, an Insured named CM was involved in a motor vehicle accident. On May 11, 2020, CM received TDT from Amit Khaneja Neurology. As a result of that TDT, Amit Khaneja Neurology generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(ix)     On April 14, 2020, an Insured named DJ was involved in a motor vehicle accident. On June 24, 2020, DJ received TDT from Amit Khaneja Neurology. As a result of that TDT, Amit Khaneja Neurology generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(x)     On October 12, 2020, an Insured named ST was involved in a motor vehicle accident. On October 28, 2020, ST received TDT from Hillside. As a result of that TDT, Hillside generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(xi)     On November 10, 2020, an Insured named II was involved in a motor vehicle accident. On December 16, 2020, II received TDT from Hillside. As a result of that TDT, Hillside generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

(xii)     On August 17, 2020, an Insured named CA was involved in a motor vehicle accident. On December 10, 2020, CA received TDT from Hillside. As a result of that TDT, Hillside generated TCD Exam Data with the following depth values: 52, 62, 67, 52, 62, 67, 47, 47, 62, 62, 75, 52, 52, 52, 52.

193.     It is extremely improbable – to the point of impossibility – that all of the Insureds who treated with the Provider Defendants would present with one of four sets of depth measurements.

194.     Moreover, it is virtually impossible that most Insureds who treated with the Provider Defendants would present with identical depth measurements.

**D.  Dr. Dorsten's Failure to Practice Medicine through Lifeline**

195.     Lifeline has never been a properly licensed medical professional corporation because Dr. Dorsten holds no credentials in neurology and has never engaged in the practice of medicine through the professional corporation.

196.     Business Corporation Law §1507 makes clear that, for a medical professional corporation to be lawfully licensed, a physician shareholder of a medical professional corporation must (i) be authorized by law to practice the profession which the professional corporation is

authorized to practice, and (ii) be engaged in the practice of medicine through the professional corporation.  BCL § 1507 provides as follows:

> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued….All shares issued, agreements made, or proxies granted in violation of this section shall be void.

197.   Legislative history confirms that a medical professional corporation's putative physician-owner not only must be licensed to practice medicine but must also be engaged in the practice of medicine through the medical professional corporation.  For example, in commenting on the proposed amendment to BCL § 1507 in 1971, the State Education Department, stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

198.   Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.

> The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued".

199.   New York's Department of Health was of the same opinion, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged….  (Emphasis added.)

(Copies of the memoranda are collectively annexed to this Complaint as Exhibit "6

").

200.     Since Dr. Dorsten took nominal ownership of Lifeline, Dr. Dorsten has never engaged in the practice of medicine through Lifeline as required by New York law.

201.     Upon information and belief, not a single one of the bills that were submitted to GEICO for reimbursement by Lifeline were for services actually performed by Dr. Dorsten.

202.     At all relevant times Dr. Dorsten has owned and been employed by Dorsten Radiology, P.C. and Dorsten Medical, P.C.

203.     Upon information and belief Dr. Dorsten did not (i) supervise any of the treatment or services allegedly provided to Insureds through Lifeline, or (ii) supervise or train any of the medical professionals that allegedly provided the Fraudulent Services for Lifeline.

204.     Lifeline exclusively provides neurological services, however Dr. Dorsten is a radiologist, not a neurologist, and, upon information and belief, has neither the training nor the medical expertise to perform and/or interpret neurological tests.

205.     Upon information and belief Dr. Dorsten is not, and has never been, qualified to provide, interpret, and/or supervise the provision of neurological services, including those allegedly provided by the physicians and technicians associated with Lifeline.

206.     Dr. Dorsten's failure to practice medicine through the professional corporation and inability to supervise the physicians and technicians who rendered the Fraudulent Services compromised patient care and resulted in unnecessary testing.

### E.  Dr. Duhamel's Failure to Practice Medicine through Hillside

207.     Hillside has never been a properly licensed medical professional corporation because Dr. Duhamel holds no credentials in neurology and has never engaged in the practice of medicine through the professional corporation.

208.    As stated above, Business Corporation Law §1507 makes clear that, for a medical professional corporation to be lawfully licensed, a physician shareholder of a medical professional corporation must (i) be authorized by law to practice the profession which the professional corporation is authorized to practice, and (ii) be engaged in the practice of medicine through the professional corporation.

209.    Since Dr. Duhamel took nominal ownership of Hillside, Dr. Duhamel has never engaged in the practice of medicine through Hillside as required by New York law.

210.    Upon information and belief, not a single bill submitted by Hillside to GEICO was for services actually performed by Dr. Duhamel.

211.    Upon information and belief Dr. Duhamel did not (i) supervise any of the treatment or services allegedly provided to Insureds through Hillside, or (ii) supervise or train any of the medical professionals that allegedly provided the Fraudulent Services for Hillside.

212.    Hillside exclusively provides neurological services, however Dr. Duhamel is an internist, not a neurologist, and, upon information and belief, has neither the training nor the medical expertise to perform and/or interpret neurological tests.

213.    Upon information and belief Dr. Duhamel is not, and has never been, qualified to provide, interpret, and/or supervise the provision of neurological services, including those allegedly provided by the physicians and technicians associated with Hillside.

214.    Furthermore, based on findings of fact by the New York State Board in a Determination and Order dated July 28, 2021, Dr. Duhamel was likely unable and/or unfit to practice medicine during the time that Hillside was purportedly performing services.

215.     Dr. Duhamel's failure to practice medicine through the professional corporation and inability to supervise the physicians and technicians who rendered the Fraudulent Services compromised patient care and resulted in unnecessary testing.

### F.     Lifeline and Hillside's Fraudulent Billing for Services Provided by Independent Contractors

216.     Defendants' fraudulent scheme also included submission of bills to GEICO seeking payment for services performed by independent contractors.

217.     Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

218.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); and  DOI Opinion Letter, February 5, 2002 (refusing

to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society). Copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "7."

219.   At all relevant times, the bills submitted by Lifeline and Hillside included charges for services that were provided by persons having no employment relationship with Lifeline or Hillside.

220.   At all relevant times, neither Lifeline nor Hillside had any neurologists on staff who were actual employees of the professional corporations.

221.   Roy Shanon, M.D. ("Dr. Shanon") is identified as the reading neurologist on virtually every report submitted to GEICO by Lifeline. However, Dr. Shanon was an independent contractor, not an employee, of Lifeline.

222.   Either Omar Ahmed, M.D. ("Dr. Ahmed") or Dr. Shanon is identified as the reading neurologist on virtually every report submitted to GEICO by Hillside. However, Dr. Ahmed and Dr. Shanon were independent contractors, not employees, of Hillside.

223.   Dr. Shanon maintained non-exclusive relationships with Lifeline and Hillside and contemporaneously performed services on behalf of other medical practices, some of which were in direct competition with Lifeline and Hillside.

224.   For example, Lifeline and Hillside billed GEICO for neurology services performed by Dr. Shanon, while at the same time GEICO received bills for services performed by Dr. Shanon at several other neurology practices that are in direct competition with Lifeline and Hillside.

225.   During the time when he was purportedly employed by Lifeline and Hillside, Dr. Shanon was also working with the following facilities:

      (i)      Healthcare Medical Services, P.C.

      (ii)     Regal Diagnostics, LLC

    (iii)    SMB Medical, P.C.

    (iv)    Healthwise Medical Associates, P.C.

    (v)    Central Park East Medical, P.C.

    (vi)    Metro Point Medical, P.C.

    (vii)    Nassau Queens Medical, P.C.

    (viii)    Daniel Shapiro, M.D.

226.    Furthermore, during the time when he was purportedly employed by Hillside, Dr. Shanon was also working with the following facilities:

    (i)    Healthcare Medical Services, P.C.

    (ii)    Regal Diagnostics, LLC

    (iii)    SMB Medical, P.C.

    (iv)    Healthwise Medical Associates, P.C.

    (v)    Central Park East Medical, P.C.

227.    Additionally, Dr. Shanon worked without any supervision by Dr. Dorsten or Dr. Duhamel as, upon information and belief, neither Dr. Dorsten nor Dr. Duhamel were qualified to provide such supervision and both Dr. Dorsten and Dr. Duhamel maintained full time employment at other medical practices.

228.    Dr. Ahmed maintained a non-exclusive relationship with Hillside, and contemporaneously performed services on behalf of other medical practices, some of which were in direct competition with Hillside.

229.    For example, Hillside billed GEICO for neurology services performed by Dr. Ahmed, while at the same time GEICO received bills for services performed by Dr. Ahmed at several other neurology practices that are in direct competition with Lifeline.

230.     In fact, during the time when he was purportedly employed by Hillside, Dr. Ahmed was affiliated with the following facilities as an alleged employee:

(i)      Svetlana Fish Physician, P.C.

(ii)     Modern Brooklyn Medical, P.C.

(iii)    Healthwise Medical Associates, P.C.

(iv)     Northern Medical Care, P.C.

(v)      Metro Point Medical P.C.

(vi)     East Coast Medical Care P.C.

(vii)    Daniel Shapiro M.D.

231.     Additionally, Dr. Ahmed worked without any supervision by Dr. Duhamel as, upon information and belief, Dr. Duhamel was not qualified or able to provide such supervision.

232.     By electing to treat the healthcare professionals as independent contractors rather than employees, the Defendants realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the health care professionals.

233.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement.

234.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

235.    Because Dr. Shanon and Dr. Ahmed were independent contractors when they performed the Fraudulent Services, Lifeline and Hillside never had any right to bill or collect No-Fault Benefits in connection with those services.

## G. **The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

236.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

237.    The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of the Provider Defendants were false and misleading in the following material respects:

(i)     The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Provider Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Provider Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and referral arrangements amongst the Defendants and others.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of Hillside and Lifeline uniformly misrepresented to GEICO

72

that Hillside and Lifeline were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, Hillside and Lifeline were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were rendered by independent contractors as opposed to Hillside and Lifeline's employees.

(iv)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of Hillside and Lifeline uniformly fraudulently concealed the fact that Hillside and Lifeline are professional corporations operating in violation of material licensing laws in that they are medical professional corporations nominally owned by physicians who do not actually practice medicine through the professional corporations.

### H. **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

238.     The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

239.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

240.     Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery of the fact that the Provider Defendants unlawfully exchanged kickbacks for patient referrals.

241.     Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Provider Defendants unlawfully exchanged kickbacks for patient referrals.

242.     Furthermore, the billing and supporting documentation submitted by the Provider Defendants for the Fraudulent Services, when viewed in isolation, did not reveal its fraudulent nature.

243.     Nevertheless, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

244.     In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the health care professionals associated with the Lifeline and Hillside in order to prevent GEICO from discovering that the health care professionals performing many of the Fraudulent Services were not employed by the Provider Defendants.

245.     In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that Dr. Dorsten did not practice medicine through Lifeline and Dr. Duhamel did not practice medicine through Hillside.

246.     The Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

247.     The Defendants' collection efforts through numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

248.     GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the

fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $710,000.00 based upon the fraudulent charges.

249.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

<u>**AS AND FOR A FIRST CAUSE OF ACTION**</u>
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

250.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

251.    There is an actual case in controversy between GEICO and the Defendants regarding more than $2,800,000.00 million in fraudulent billing for the Fraudulent Services that has been submitted to GEICO under the names of the Provider Defendants.

252.    Specifically, there is more than $900,000.00 in pending fraudulent billing from the Fraudulent Macias Practice; $820,000.00 in pending fraudulent billing from Lifeline; $210,000.00 in pending fraudulent billing from Amit Khaneja Neurology; and $900,000.00 in pending fraudulent billing from Hillside.

253.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

254.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants, and others.

255.     The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Lifeline or Hillside because, in many cases, the Fraudulent Services were provided by independent contractors, rather than by employees of Lifeline or Hillside.

256.     The Defendants have no right to receive payment for any pending bills submitted to GEICO for services purportedly rendered through Lifeline or Hillside because Lifeline and Hillside are professional corporations that are operating in violation of material licensing laws in that they are medical professional corporations nominally owned by medical doctors who do not actually practice medicine through the professional corporation.

257.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

> (i)     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

> (ii)    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others;

> (iii)   The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Lifeline or Hillside because, in many cases, the Fraudulent Services were provided by independent contractors, rather than by employees of Lifeline or Hillside; and

> (iv)    The Defendants have no right to receive payment for any pending bills submitted to GEICO for services purportedly rendered through Lifeline or Hillside because Lifeline and Hillside are professional corporations that are operating in violation of material licensing laws in that they are medical

76

professional corporations nominally owned by medical doctors who do not actually practice medicine through the professional corporation.

### AS AND FOR A SECOND CAUSE OF ACTION
**Against Dr. Dorsten and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

258.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

259.    Lifeline is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

260.    Dr. Dorsten and John Doe Defendants "1" – "10" knowingly have conducted and/or participated, directly or indirectly, in the conduct of Lifeline's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over twenty-two months seeking payments that Lifeline was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) Lifeline obtained its patients through the Defendants' illegal kickback scheme; (iv) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Lifeline's employees; and (v) Dr. Dorsten never practiced medicine through the professional corporation. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

261.    Lifeline's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular

ways in which Dr. Dorsten operated Lifeline, inasmuch as Lifeline never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Lifeline to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Lifeline to the present day.

262.    Lifeline is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Lifeline in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

263.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $123,000.00 pursuant to the fraudulent bills submitted by the Defendants through Lifeline.

264.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Dr. Dorsten and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

265.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

266.    Lifeline is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

267.    Dr. Dorsten and John Doe Defendants "1" – "10" are employed by and/or

associated with the Lifeline enterprise.

268.    Dr. Dorsten and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Lifeline's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over twenty-two months seeking payments that Lifeline was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) Lifeline obtained its patients through the Defendants' illegal kickback scheme; (iv) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Lifeline's employees; and (v) Dr. Dorsten never practiced medicine through the professional corporation.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

269.    Dr. Dorsten and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

270.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $123,000.00 pursuant to the fraudulent bills submitted by Dr. Dorsten and John Doe Defendants "1" – "10" through Lifeline.

271.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and

proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against Dr. Dorsten, John Doe Defendants "1" – "10" and Lifeline
### (Common Law Fraud)

272.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

273.   Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

274.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Lifeline was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline; (iii) in every claim, the representation that the billed-for services were provided by employees of Lifeline, when in fact many of the billed-for services were provided by independent contractors; and (iv) in every claim, the representation that Lifeline was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that Dr. Dorsten never practiced medicine through the professional corporation.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise

the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

275.    Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Lifeline that were not compensable under the No-Fault Laws.

276.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $123,000.00 pursuant to the fraudulent bills submitted by Dr. Dorsten and John Doe Defendants "1" – "10" through Lifeline.

277.    Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

278.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline
### (Unjust Enrichment)

279.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

280.    As set forth above, Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

281.     When GEICO paid the bills and charges submitted by or on behalf of Lifeline for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

282.     Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

283.     Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

284.     By reason of the above, Dr. Dorsten, John Doe Defendants "1" – "10", and Lifeline have been unjustly enriched in an amount to be determined at trial, but in no event less than $123,000.00

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against Dr. Macias, John Doe Defendants "1" – "10" and
the Fraudulent Macias Practice
(Common Law Fraud)**

285.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

286.     Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

287.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Macias Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it

obtained patients through an illegal kickback scheme; and (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice. The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

288.    Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Fraudulent Macias Practice that were not compensable under the No-Fault Laws.

289.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $156,000.00 pursuant to the fraudulent bills submitted by Dr. Macias and John Doe Defendants "1" – "10" through the Fraudulent Macias Practice.

290.    Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

291.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**Against Dr. Macias, John Doe Defendants "1" – "10",**
**and the Fraudulent Macias Practice**
**(Unjust Enrichment)**

292.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

293.     As set forth above, Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

294.     When GEICO paid the bills and charges submitted by or on behalf of the Fraudulent Macias Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

295.     Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

296.     Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

297.     By reason of the above, Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice have been unjustly enriched in an amount to be determined at trial, but approximately $156,000.00.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**Against Dr. Khaneja and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

298.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

299.     Amit Khaneja Neurology is an ongoing "enterprise", as that terms is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

300.     Dr. Khaneja and John Doe Defendants "1" – "10" knowingly have conducted and/or participated, directly or indirectly, in the conduct of Amit Khaneja Neurology's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Amit Khaneja Neurology was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; and (iii) Amit Khaneja Neurology obtained its patients through the Defendants' illegal kickback scheme. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

301.     Amit Khaneja Neurology's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Dr. Khaneja operated Amit Khaneja Neurology, inasmuch as Amit Khaneja Neurology never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Amit Khaneja Neurology to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Amit Khaneja Neurology to the present day.

302.     Amit Khaneja Neurology is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Amit Khaneja Neurology in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

303.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $101,000.00 pursuant to the fraudulent bills submitted by Dr. Khaneja and John Doe Defendants "1" – "10" through Amit Khaneja Neurology.

304.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A NINTH CAUSE OF ACTION
**Against Dr. Khaneja and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

305.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

306.     Amit Khaneja Neurology is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

307.     Dr. Khaneja and John Doe Defendants "1" – "10" are employed by and/or associated with the Amit Khaneja Neurology enterprise.

308.     Dr. Khaneja and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Amit Khaneja Neurology's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit

86

or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Amit Khaneja Neurology was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iii) Amit Khaneja Neurology obtained its patients through the Defendants' illegal kickback scheme. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3."

309.    Dr. Khaneja and John Doe Defendants "1" – "10" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

310.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $101,000.00 pursuant to the fraudulent bills submitted by Dr. Khaneja and John Doe Defendants "1" – "10" through Amit Khaneja Neurology.

311.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TENTH CAUSE OF ACTION
**Against Dr. Khaneja, John Doe Defendants "1" – "10" and Amit Khaneja Neurology**
**(Common Law Fraud)**

312.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

313.    Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology intentionally and knowingly made false and fraudulent statements of material fact to GEICO and

concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

314.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Amit Khaneja Neurology was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; and (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology. The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

315.    Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Amit Khaneja Neurology that were not compensable under the No-Fault Laws.

316.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $101,000.00 pursuant to the fraudulent bills submitted by Dr. Khaneja and John Doe Defendants "1" – "10" through Amit Khaneja Neurology.

317.    Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

318.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**Against Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology**
**(Unjust Enrichment)**

319.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

320.     As set forth above, Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

321.     When GEICO paid the bills and charges submitted by or on behalf of Amit Khaneja Neurology for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

322.     Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

323.     Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

324.     By reason of the above, Dr. Khaneja, John Doe Defendants "1" – "10", and Amit Khaneja Neurology have been unjustly enriched in an amount to be determined at trial, approximately $101,000.00

## AS AND FOR A TWELFTH CAUSE OF ACTION
### Against Hillside and John Doe Defendants "1" – "10"
### (Common Law Fraud)

325.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

326.    Hillside and John Doe Defendants "1" – "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

327.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Hillside was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich Hillside and John Doe Defendants "1" – "10"; (iii) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Hillside's employees; and (iv) in every claim, the representation that Hillside was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that Dr. Duhamel never practiced medicine through the professional corporation. The fraudulent billings and corresponding mailings submitted to GEICO that comprise the fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

328.    Hillside and John Doe Defendants "1" – "10" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Hillside that were not compensable under the No-Fault Laws.

329.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,000.00 pursuant to the fraudulent bills submitted by Hillside and John Doe Defendants "1" – "10."

330.    Hillside and John Doe Defendants "1" – "10"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

331.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Against Hillside and John Doe Defendants "1" – "10"
### (Unjust Enrichment)

332.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

333.    As set forth above, Hillside and John Doe Defendants "1" – "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

334.    When GEICO paid the bills and charges submitted by or on behalf of Hillside for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

335.   Hillside and John Doe Defendants "1" – "10" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

336.   Hillside and John Doe Defendants "1" – "10"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

337.   By reason of the above, Hillside and John Doe Defendants "1" – "10" have been unjustly enriched in an amount to be determined at trial, but in no event less than $350,000.00.

**AS AND FOR A FOURTEENTH CAUSE OF ACTION**
**Against John Doe Defendants "1" – "10"**
**(Aiding and Abetting Fraud)**

338.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

339.   John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by the Owner Defendants and the Provider Defendants.

340.   The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly assisting with the operation of the Provider Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Provider Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

341.   The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for the Owner Defendants or the Provider Defendants

to obtain referrals of patients at the No-Fault Clinics, subject those patients to medically unnecessary services, and obtain payment from GEICO and other insurers for the Fraudulent Services.

342.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to the Owner Defendants and the Provider Defendants for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

343.    The conduct of John Doe Defendants "1" – "10" caused GEICO to approximately $730,000.00 pursuant to the fraudulent bills submitted through the Provider Defendants.

344.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

345.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

346.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Dr. Dorsten and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in

excess of $123,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Dr. Dorsten and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $123,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Dr. Dorsten, John Doe Defendants "1" – "10" and Lifeline, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $123,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Dr. Dorsten, John Doe Defendants "1" – "10" and Lifeline, more than $123,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Dr. Macias and John Doe Defendants "1" – "10", and the Fraudulent Macias Practice compensatory damages in favor of GEICO an amount to be determined at trial but approximately $156,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Dr. Macias, John Doe Defendants "1" – "10", and the Fraudulent Macias Practice, approximately $156,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Dr. Khaneja and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but

approximately $101,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.       On the Ninth Cause of Action against Dr. Khaneja and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $101,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.       On the Tenth Cause of Action against Dr. Khaneja, John Doe Defendants "1" – "10" and Amit Khaneja Neurology, compensatory damages in favor of GEICO an amount to be determined at trial but approximately $101,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.       On the Eleventh Cause of Action against Dr. Khaneja, John Doe Defendants "1" – "10" and Amit Khaneja Neurology, approximately $101,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

L.       On the Twelfth Cause of Action against Hillside and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $350,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.       On the Thirteenth Cause of Action against Hillside and John Doe Defendants "1" – "10", more than $350,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

N.       On the Fourteenth Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but

approximately $730,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: August 13, 2021

RIVKIN RADLER LLP

By:   /s/ *Michael Sirignano*

       Michael A. Sirignano, Esq.
       Barry I. Levy, Esq.
       Priscilla D. Kam, Esq.
       Joanna B. Rosenblatt, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*